[Criminal No. 772. Filed May 16, 1932.]

[11 Pac. (2d) 351.]

ARTHUR LEPKER, Appellant, v. STATE, Respondent.

Mr. L. C. McNabb, for Appellant.

Mr. K. Berry Peterson, Attorney General, Mr. Renz L. Jennings, Assistant Attorney General, and Mr. Lloyd J. Andrews, County Attorney, for the State.

ROSS, J.—Upon a charge of murdering one Jim Bradney, *alias* Frank Edwards, on July 22, 1931, defendant Arthur Lepker was tried and convicted of murder in the second degree. He was sentenced to a term of twenty-five to fifty years in the state prison. He has appealed.

The defendant has attempted to justify his act on the ground of self-defense, or, as we shall see, on the ground that the deceased was an all-around criminal and bad man generally, of whom he was in mortal fear.

The assignments are: (1) That the court erred in refusing to permit the defendant to introduce evidence of specific acts of violence towards other persons by the deceased, within defendant's knowledge; and (2) of such acts of violence of which he had been informed by others, for the purpose of showing who was the probable aggressor.

The undisputed facts are that defendant and deceased were members of a gang of an indefinite number of persons living in and around Phoenix, and more or less loosely associated together in the business of relieving other persons of their money and property by violent means. The evidence shows quite conclusively that they were denizens of the underworld and entertained no respect for law or for property. A short time before defendant killed Edwards, he, Edwards and three others (Virgil Hutchins, ''Blackie'' Borrell and Maynard S. Thompson, sometimes known as Jack Thompson), in the latter's automobile went from Phoenix to Brawley and Watsonville, California, for the specific purpose of replenishing their finances by holdups and robberies. They ''hi-jacked'' a bootlegger's place and either robbed or undertook to rob other persons or places here in Arizona. For some time deceased and defendant were together frequently, at all hours of the day and night, visited the same places, and had the same set of associates. Along in the evening of July 22, 1931, between nine and ten o'clock, the deceased, one Juanita Fisher, and defendant, riding in Thompson's Ford sedan, the defendant driving, visited Frank and Toy Robertson's cabin on East Van Buren Street and spent ten or fifteen minutes, when defendant and deceased left in the same car, the Fisher woman staying with the Robertsons. This was the last time Edwards was seen alive.

About one hour thereafter the defendant returned to the Robertson cabin alone. On one wheel of the automobile there was no tire. Defendant explained that he turned a corner too fast and the tire came off; that Edwards got scared at his fast driving and jumped out of the car. A tire was put on this wheel and the party, consisting of defendant, Juanita Fisher and Frank Robertson, got into the car and went to

Juanita's place at 1610 West Madison Street. They were followed by Toy Robertson and Virgil Hutchins in another car. Here they evidently had a drinking bout, for defendant says: "I went home (Juanita's place) to get a drink, to brace myself up, and I got drunk."

In the afternoon of July 23d an Indian boy by the name of Luke Lewis was driving a truck from St. John's Mission to Laveen when he discovered Edwards' body lying on the ground, face down, about 4,000 feet south of the mission. After determining that Edwards was dead, he drove on to Laveen and reported to the sheriff. The sheriff's office sent out some deputies and an ambulance, got the body, and inspected the ground in its vicinity. The body had been dragged, face down, about twenty feet from where it fell. On the east side of the "drag" and about two feet from where it started, there was found a .38–Colt's revolver. The body was about 310 feet from where an automobile had been parked and toward the mission. The autopsy showed that Edwards had been shot in the back of the neck, at about the level of the second cervical vertebrae. The bullet cut the spinal cord and came to a stop in the anterior part of the vertebrae. The entrance wound was about the center of the neck. The wound was such as to cause instant death.

Two or three days after the body was found defendant was arrested, and soon thereafter made a voluntary confession to the county attorney of Maricopa county, which was taken down in shorthand.

Testifying at the trial defendant told of having been associated with the deceased in his criminal ventures. Said that deceased so dominated him that he went with him on his criminal excursions through fear; that deceased on numerous occasions threatened to kill him; that deceased had blamed him for several

failures to carry out planned robberies; that deceased was in the habit of carrying around with him a bottle of nitroglycerine and that he was afraid if he did not do as deceased wanted him to do that he would blow him up; that deceased told him if he opened his mouth he would blow his "damned brains out"; that he punched him in his ribs with his gun until he was sore and forced him "by gun point on several jobs." He stated that on the afternoon of the 22d of July Mrs. Ray Phillips came to Juanita Fisher's house, where he was, and "told me about a threat he (Edwards) made to his wife, talking about taking me on the desert and leaving me that night, July 22d"; that about twenty minutes after Mrs. Phillips had told him of Edwards' threat the latter came to Juanita's house and told defendant that he was going to hold up the Indian mission (St. John's Mission) out near Laveen that night and "that I was going with him," "just him and I" and "nobody else at all"; that he tried to get Edwards to let Jack Thompson go too. He told of Edwards, Juanita Fisher, Jack Thompson, Virgil Hutchins and himself (at the wheel) driving from Juanita's place to the downtown district of Phoenix, where it seems Jack Thompson and Virgil Hutchins left the car, and the deceased, Juanita Fisher, and defendant continued on to the Close Inn Auto Camp, or Robertson's, where they left Juanita. He said the automobile belonged to Jack Thompson; that Thompson loaned it that night to Edwards on condition that defendant would drive it. After leaving Juanita he said: "Frank says, 'Let's go and get this job over with,' and I drove at his command out on the desert near Laveen." He told about parking the car on the desert, and said: "I got out of the car and stood at the left side of the car for a few minutes, and he got out and stood back at the rear, and then he told me to 'Come on, let's get this over with,' I glanced around and couldn't see anything but desert,

and we walked for about 300 feet. I was to the right and noticed him jerk the gun out of his shirt and turn towards me, and I jumped behind him and shot.'' He stated that at the time he shot he was pretty nervous and highly excited; that he thought it was his last ride on earth. When asked, ''Why did you shoot Frank Edwards?'' he answered, ''Self-defense.'' A juror asked permission to ask a question of defendant. His question and defendant's answer thereto are as follows:

''A Juror: I would like to have Art demonstrate the movements he went through when he shot this fellow.

''The Witness: With the excitement I was in, I am afraid, it is impossible. I cannot move the way I did at that moment; it is absolutely impossible.''

In his confession to the county attorney he gave the following statement concerning the events immediately following the parking of the car on the desert: ''He (Edwards) got out, stood behind the car, leaned against the spare tire a minute or two, and he says 'Hell, we might just as well go and get this over' and he took his gun out, put it in his hand. I couldn't figure that; I couldn't see no place then.'' And he was asked the following questions to which he made answer as follows:

''Q. How did you happen to step back of him; how could you do it without him noticing it? A. I lagged behind him until I got behind him ten or fifteen feet.

''Q. How could you have come up on him quick without him noticing? A. I was behind him.

''Q. How could you slip up on him with the gun? A. That I don't know.''

We will now consider the assignments.

If any offer of evidence of specific acts of violence by deceased of which he had been informed by others was rejected, defendant has failed to point it out in his brief. ''Blackie'' Borrell, Jack Thompson, Ray

Phillips, Arthamos Phillips, his wife, and one Stephen Taylor were permitted to testify to threats or complaints made by deceased against defendant, and they were admitted whether communicated to defendant or not. The second assignment is without basis in fact.

The specific acts within the defendant's personal knowledge, offered to be proved but rejected by the court, were that the deceased had told defendant of blowing up with nitroglycerine an occupied house in Phoenix and of defendant's begging him for more than an hour not to blow up another house, on Seventh Street, occupied by a woman and four or five little children, and that deceased had told him of murdering a man in California and another in New Mexico. This rejected testimony was offered by the defendant for the purpose, he asserts, of showing who was the probable aggressor. We think the court's ruling was correct, for two reasons: It is settled law that it is competent to show an act of violence by deceased when it "bears some relation to or grows out of the same transaction as the one in which the homicide occurs, or where by reason of its proximity in time, place and circumstances it would legitimately reflect upon the conduct or motives of the parties at the time of the affray," whether the defendant had knowledge thereof or not, when the facts and circumstances attending the homicide make it doubtful as to who was the aggressor; but where the facts and circumstances demonstrate beyond peradventure that the deceased had at the time committed no overt act nor made any move to harm the defendant, such evidence is inadmissible for any purpose. *Mendez* v. *State*, 27 Ariz. 82, 229 Pac. 1032; *Murphy* v. *State*, 33 Ariz. 336, 264 Pac. 685.

The location of the wound on the deceased, it seems to us, is incontrovertible evidence that he was shot from behind. That such was the fact was corrobo-

rated by defendant himself in his confession, for he says: "I lagged behind him until I got behind him ten or fifteen feet; I was behind him." In his testimony at the trial he still admits he shot from behind. This, of course, he had to admit in view of the physical facts; but he attempts to explain this by stating that when he saw deceased draw his gun he jumped behind him and shot. In other words, he would have it believed that deceased, intent upon killing defendant, would stand or walk with his back to defendant after drawing his pistol for the purpose of killing defendant. He admitted in his testimony that deceased fell forward and that he dragged the body to where it was found with the face to the ground. We think all the facts, notwithstanding defendant said he shot in self-defense, show he assassinated Edwards and that being true, the desperate, criminal and vicious disposition of the deceased was immaterial. The fact that deceased was carrying a pistol, or that he may have been carrying it, in his hand when shot, in view of the mission he and defendant were on, can give rise to no presumption that he was about to use it on defendant. On the contrary, they were armed to enforce the surrender to them by St. John's Mission of funds dedicated to the education and training of Indian children attending such institution. When defendant refused upon the request of a juror "to demonstrate the movements he went through when he shot this fellow" by saying, "I cannot move the way I did at that moment; it is absolutely impossible," we think he unwittingly admitted that his narrative of the occurrence was utterly false. Indeed, it was "absolutely impossible" for him, as it would be for anyone, to shoot as he says he did anything but a dummy or manikin. A live, wilful man would not menacingly draw a deadly weapon on his enemy and permit the enemy to step behind him and shoot him in the back of the neck. Defendant knew the futility of trying to

re-enact his movements as he told them. It would have been an easy matter to demonstrate the movements he actually went through when he shot Edwards. No one knows his movements except defendant, but everybody knows that it was not done as he states in his testimony at the trial. It is entirely possible that he went through the movements he described in his confession to the county attorney, and if so it was nothing but an assassination.

Another thing, if we are to believe the evidence, that of the defendant and his and Edwards' associates, it shows this: That defendant knew that he was, as he says, being "taken for a ride." He had been told that deceased had said that very afternoon he was going to take defendant out on the desert and leave him there. He knew when he started on that trip, if we may believe him, that he was not going out to assist deceased in holding up St. John's Mission but to be killed unless he was the quicker on the trigger. Under the circumstances, he is in no position, having armed himself and voluntarily gone with deceased, even though deceased was the assailant, to invoke the natural and God-given right of self-defense. On this feature of the case the court gave the following instruction:

"I further instruct you, gentlemen, that the law of self-defense does not imply the right to retaliate upon another for real or supposed injury or for revenge. I therefore charge you that if you find that the defendant voluntarily entered into a difficulty with the deceased for the purpose of reaping revenge upon him for some supposed or real injury, then the defendant cannot avail himself of the law of self-defense, no matter how great the danger nor how imminent the peril that confronts him. The law holds him to a strict accountability under the circumstances unless he has really and in good faith endeavored to withdraw from the conflict before resorting to the extremity of taking human life."

That this is a correct statement of the law and applicable to the facts of this case is not questioned.

We do not credit the defendant's story to the effect that deceased compelled him to go with him on this fatal ride; that he was afraid of the deceased, and that the reason he did not quit running with the deceased was that if he did he was afraid the deceased would kill him or blow him up with nitroglycerine. It would have been a very easy and simple matter for the defendant to have reported the situation to the peace officers and had the deceased apprehended and imprisoned, if all the things related by him, or in fact any of them, were true. He did not have to go with the deceased, but did so as a matter of choice.

If we are to believe the current history of gangdom as we gather it from the newspapers, difficulties of this kind not infrequently arise among the members of organized crime. Every day or two we read that someone has been "taken for a ride" by disgruntled members of his own gang or by rival gangsters. We think it very probable that in this instance the deceased was the one who was taken for the ride.

We cannot understand the moderation of the jury's verdict except upon the theory that it recognized the evidence conclusively showed the deceased was a hardened criminal, a menace to society, and accordingly reduced what otherwise would have deserved the severest punishment fixed by law to murder in the second degree.

We find no prejudicial error in the record, and therefore affirm the judgment.

McALISTER, C. J., and LOCKWOOD, J., concur.