406 P.2d 397

**STATE of Arizona, Appellee,**

**v.**

**Leonis Johnny GRIFFIN, Appellant.**

**No. 1489.**

Supreme Court of Arizona.

En Banc.

Oct. 8, 1965.

Darrell F. Smith, Atty. Gen., Robert W. Pickrell, Former Atty. Gen., Phoenix, Norman E. Green, County Atty., of Pima County, Carl Waag, Deputy County Atty., Tucson, for appellee.

Sidney L. Kain, Fred R. Sands, Tucson, for appellant.

LOCKWOOD, Chief Justice:

On November 18, 1963, the County Attorney of Pima County, in a three count information, charged the defendant-appellant Leonis Johnny Griffin with (1) the crime of murder of Thomas Francis Mulrow, (2) assault with intent to commit the murder of the defendant's wife, Beverly Griffin, and (3) assault with intent to commit the murder of Charles G. Nichols, Jr. The case was tried to a jury which found the defendant guilty of (1) murder in the second degree of Thomas Francis Mulrow, (2) assault with intent to commit the murder of Beverly Griffin, and (3) not guilty of assault with intent to commit the murder of Charles Gilbert Nichols, Jr. Thereafter, on February 25, 1964, the court sentenced the defendant to imprisonment in the State Prison for the term of not less than ten years and not more than fifteen years for the assault with intent to commit murder of Beverly Griffin, and to imprisonment in the State Prison for the rest of his natural life for the murder in the second degree, the sentences to run consecutively in the order stated. Defendant has appealed from the final order of judgment made and entered and from the sentence.

According to our well established rule, we must consider the facts in the light most favorable to sustaining the conviction. Defendant and Beverly Griffin were married at Lincoln, Nebraska approximately nine years prior to the date of the offenses charged. They had many marital difficulties and had separated and reconciled numerous times. During the course of their marriage they had four children. While they were living together, prior to moving to Tucson, Beverly obtained a divorce from the defendant. The defendant was unaware that the divorce decree had been issued, and they continued to live together.

Shortly prior to the date of the alleged crimes Beverly Griffin moved to Tucson to live with a sister. Defendant followed Beverly to Tucson and they resumed living together. About a week before the date of the crimes charged, they had difficulties and the defendant moved out of their apartment. These marital difficulties arose from the fact defendant objected to Beverly's working as a barmaid. However, during

this period of separation the defendant and Beverly spent a number of nights together in an automobile parked in the desert.

During this same period of time, while she was employed as a barmaid, Beverly became acquainted with Charles Gilbert Nichols, Jr. and invited him to visit her. On October 26, 1963, the date of the alleged crimes, at approximately two o'clock in the afternoon, Nichols, together with the deceased Mulrow, visited Beverly at her apartment. They talked in the apartment and drank beer, becoming intoxicated.

Defendant, while driving a truck for his employer, a bakery, rode past the apartment and saw a strange automobile parked in front. He went in and said that he wished to talk to his wife in private. The two men refused to leave, and forcibly put him out. Defendant exhibited a pocket knife, but did not attempt to use it on either of them.

After the defendant had completed his day's work, between three and four o'clock in the afternoon, he bought a .22 caliber pistol, took a taxi cab, and returned to the apartment, where his wife and two men remained. Once inside the apartment, an altercation ensued. Nichols arose. The defendant fired a shot over Nichols' head and Nichols sat down. Defendant claimed that Mulrow advanced toward him, whereupon the defendant shot Mulrow. This shot resulted in Mulrow's death. Immediately after the shot the defendant's wife ran out of the apartment. The defendant ran after her, shooting at her. The defendant then walked to the bar at which his wife was employed and exhibited the gun to the owner of the bar and a man by the name of James W. Kaufman. He told them that he shot his wife and another man.

There is testimony that the defendant could not keep jobs and had had financial difficulties. Two days prior to the crimes charged the defendant's wife had filed a sanity petition against defendant seeking to have defendant placed under observation because she believed him to be mentally ill.

During the course of the trial the defendant raised the issue of self-defense with regard to the shooting of Mulrow, and the court instructed the jury on such issue. Defendant attempted to present testimony of Mulrow's reputation in the community for the character traits of argumentativeness, belligerence and quarrelsomeness. Upon objection, defendant made an offer of proof to the effect that when Mulrow was sober he was a very mild mannered person, very polite, nice to talk to and very intelligent, but when under the influence of alcohol he was arrogant and belligerent. The court refused to permit the testimony. This was error.

This court in Mendez v. State, 27 Ariz. 82, 229 P. 1032 (1924) stated:

"It is the rule that where it is questionable as to which was the aggressor, or where the state of mind of defend-

ant at the time of the affray is in issue under the claim of justification, that the general reputation of the deceased as a dangerous, turbulent, and violent man may always be shown."

\* \* \* \* \* \* \*

"The trend, \* \* \* of the more recent decisions appears to be in the direction of allowing to go before the jury evidence of particular acts of violence and turbulence by the deceased towards third persons, when such acts may legitimately and reasonably be of aid to the jury in determining whether defendant's claim of self-defense was *bona fide* and rooted in an honest belief of impending danger at the time he acted."

And in Lawrence v. State, 29 Ariz. 247, 240 P. 863 (1925) we said:

"[E]vidence that the deceased had a disposition of a nature which might have caused him to be the assailant is admissible for the sole purpose of showing who was the aggressor \* \* \*." See also Lepker v. State, 40 Ariz. 186, 11 P.2d 351 (1932).

The United States Supreme Court in Smith v. United States, 161 U.S. 85, 16 S.Ct. 483, 40 L.Ed. 626 (1895) held that:

"[E]vidence that the deceased had the general reputation of being a quarrelsome and dangerous person, was competent, \* \* \*."

In Evans v. United States, 107 U.S.App. D.C. 324, 277 F.2d 354 (1960) the court held that evidence to the effect that the decedent was aggressive when drunk, upon a plea of self-defense, though unknown to the defendant is admissible.

See also 1 Wigmore § 63:

"When the issue of self-defense is made in a trial for homicide, and thus a controversy arises *whether the deceased was the aggressor,* one's persuasion will be more or less affected by the character of the deceased; it may throw much light on the probabilities of the deceased's action: \* \* \*. [The] additional element of communication is unnecessary; for the question is what the deceased probably did, not what the defendant probably thought the deceased was going to do. The inquiry is one of objective occurrance, not of subjective belief." (Italics in original.)

▮ The court in this case, where the issue of self-defense was raised, improperly excluded the evidence of the reputation of the deceased for belligerence, aggressiveness and quarrelsomeness while intoxicated even though such character traits were uncommunicated to the defendant.

The defendant claims that the trial court committed error in not allowing defendant to testify to his personal history during the nine years of his marriage, holding that such

testimony was too remote. The defendant also claims that the court erred by not allowing a psychiatrist, who testified that at the time of the shooting of Mulrow and the defendant's wife that the defendant did not know the difference between right and wrong, to testify with regard to the facts and circumstances in the defendant's background and the defendant's mental defects or abnormalities upon which the psychiatrist based his ultimate opinion.

As is said in 2 Wigmore, Evidence § 228:

"Sanity and insanity are terms applicable to the mode of operation of the mind as judged by some accepted standard of normality. The mode of operation of the mind is ascertainable from the conduct of the person in question, i. e. from the effect produced by his surroundings on his mind when responding by action to those surroundings. Virtually, then, the mind is one, while the surroundings are multifold; and the mode of operation cannot be ascertained to be normal or abnormal except by watching the effects through a multifold series of causes. On the one hand, no single act can be of itself decisive; while, on the other hand, any act whatever may be significant to some extent.

"The first and fundamental rule, then, will be that *any and all conduct* of the person is admissible in evidence.

There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity. It will certainly throw light one way or the other upon the issue. 'Upon this I believe that no difference of opinion will be found to exist,' said Mr. Justice Patterson, in a celebrated case, 'as to the principle on which such evidence is admissible; Every act of the party's life is relevant to the issue.' [Referring to Wright v. Tatham, 5 Cl. & F. 670, 715 (1838)]. There can be no escape from this consequence. There is no distinction in kind (whatever there may be in degree) between one or another piece of conduct as evidence to be considered; *some* inference is always possible." (Italics in original.)

As we said in State v. Crose, 88 Ariz. 389, 357 P.2d 136 (1960) where the defendant raises the issue of his sanity, the legal question which the jury must determine is the defendant's responsibility for his conduct at the time the crime was committed. To resolve this vital issue of criminal responsibility it is necessary that the jury have the entire picture of the defendant. Insanity resulting in criminal acts is not a sudden growth even if the prohibited conduct seems to be of a sudden explosive nature. Weihofen, Mental Disorder As A Criminal Defense, p. 323 (1954). The condition of the defendant must be

explained to the jury in understandable terms. We have held that it is always permissible, when searching for the real cause "to show previous troubles" if it throws light on the act constituting the crime or explains the reason for its commission. Talley v. State, 18 Ariz. 309, 159 P. 59 (1916); Leonard v. State, 17 Ariz. 293, 151 P. 947 (1915).

■ In the same vein to allow a psychiatrist as an expert witness to answer without any explanation the question of whether the accused knew the difference between right and wrong at the time he committed the act would impart a meaningless conclusion to the jury. The jury must be given an opportunity to evaluate the expert's conclusion by his testimony as to what matters he took into consideration to reach it. Therefore the psychiatrist should be allowed to relate what matters he necessarily considered as a "case history" not as to indicate the ultimate truth thereof, but as one of the bases for reaching his conclusion, according to accepted medical practice. The court should therefore exercise care in the manner in which such testimony is elicited, so that the jury may understand that the case history does not constitute factual evidence, unless corroborated by other competent evidence.

■ In applying the M'Naghten Rule as the test for criminal responsibility in this jurisdiction we are not applying a barren medical test. Indeed the medical, psychiatric question is only of incidental interest to the law. Other considerations than the medical must enter the decision. State v. Crose, supra. But, as we have said, the reasonableness of an expert's opinion and the weight to be given it are matters for the trier of facts. State v. Woolery, 93 Ariz. 76, 378 P.2d 751 (1963).

There is no question but that the criminal responsibility of the defendant was in issue, since the court below charged the jury on the question of insanity as follows:

"You are instructed, Members of the Jury, that insanity, a question raised by the evidence in this case, in its legal sense, and as used in these instructions means such disorder of the mind as renders a person incapable of knowing the nature and quality of the act that he is charged with committing and incapable of distinguishing right from wrong with regard to that act.

"Therefore, I instruct you that if, in this case, you find beyond a reasonable doubt that the defendant did commit the acts with which he is charged, yet if you entertain a reasonable doubt as to whether he knew the nature and quality of his acts and as to whether he knew them to be wrong, you must bring in a verdict of not guilty by reason of insanity."

**50**

■ In giving this charge to the jury the court attempted to apply the rule of M'Naghten's case which is the test of legal insanity in this jurisdiction. State v. Schantz, 98 Ariz. 200, 403 P.2d 521 (1965); State v. Crose, supra. However it is to be noted that the court below charged the jury in the conjunctive. This was improper. As we said in State v. Schantz, supra:

"This test of legal insanity has two elements. An accused must have had at the time of the commission of the criminal act:

"(1) Such a defect of reason as not to know the nature and quality of the act, *or*

"(2) If he did know, that he did not know he was doing what was wrong." (Italics in original.)

■ In Judd v. State, 41 Ariz. 176, 16 P.2d 720 (1932) we held that where a jury was convinced of one of the above two conditions but not convinced of the other they were required to return a verdict of not guilty by reason of insanity. The court here incorrectly applied the conjunctive and should have applied the disjunctive "or". If either of the two conditions were found to exist by the jury under M'Naghten's Rule, the jury must find the defendant criminally not responsible for the criminal act committed.

The defendant also contends that the trial court erred in allowing in opinions as to defendant's sanity by three persons with whom the defendant had worked. Each had known defendant approximately six weeks. Each gave his or her opinion that from personal observations, the witness believed that defendant "appeared to be" sane.

■ We have held that as a predicate for the opinion of a non-expert witness as to the sanity or insanity of a person whose mental condition is in issue the witnesses must state facts, circumstances, acts, conversations and conduct of the person whose sanity is in question upon which he bases his opinion. Wigley v. Whitten, 78 Ariz. 88, 276 P.2d 517 (1954); State v. Eisenstein, 72 Ariz 320, 235 P.2d 1011 (1951). In State v. Coey, 82 Ariz. 133, 309 P.2d 260 (1957) we said:

"The rule is well settled in this jurisdiction that in cases of this kind the testimony of a lay witness who has had an opportunity to observe the past conduct and history of a defendant is as admissible on the issue of whether he was legally insane at the time he committed the criminal act as that of a medical witness. * * * The fact that he is a lay witness goes not to the admissibility of the testimony but rather to its weight. Therefore, the only foundation which need be weighed to qualify such lay witness to testify on this issue is that he has had an opportunity to observe the defendant, as provided in this rule."

■ The defendant also assigns as error the fact that the court permitted the police officer who obtained a confession from the defendant and who had seen him only a short time, to testify that in his opinion the defendant was sane. The trial court properly allowed in such testimony for the reasons discussed above.

■ The defendant next claims error in that the trial court did not allow the defendant, who took the witness stand, to testify as to his state of mind on the day of the occurrences here in question. As long ago as 1919, in Ryan v. Territory, 12 Ariz. 208, 100 P. 770 (1909), we stated:

"When intent is material, the jury is authorized to infer it from the circumstances connected with the act; and, * * * the defendant is entitled, where intent or belief or motive is material, to testify directly what his intent, belief, or motive was at the time he committed the act."

See also State v. Wallace, 97 Ariz. 296, 399 P.2d 909 (1965); Richardson v. State, 34 Ariz. 139, 268 P. 615 (1928). In any event the trial court should have permitted defendant to testify as to his intent at the time the shooting incident took place. The weight of such testimony is for the jury to determine.

In this case the defendant presented the issues of self-defense and insanity. The defendant's intent, belief, and motives which led him to the commission of each of the acts during the course of the period surrounding the alleged crime had an important bearing on his defenses. The court should have allowed great latitude to the defendant in offering proof of his mental state during the actual incident involving the shooting, and during the time when the altercations commenced.

■ The prosecution offered in evidence a written statement prepared by the Tucson Police Department and signed by the defendant after interrogation on the date of the incident. The defense counsel objected to its admissibility based on its voluntariness and there was a hearing in chambers, outside of the presence of the jury. The trial court found only "that there is a prima facie showing that the statement was voluntary or the confession was voluntary," and submitted the statement to the jury. We have held that the trial judge must make "a definite determination whether the purported confession was voluntary or involuntary." State v. Ortiz, 97 Ariz. 228, 399 P.2d 171 (1965); See also State v. Owen, 96 Ariz. 274, 394 P.2d 206 (1964); State v. Costello, 97 Ariz. 220, 399 P.2d 119 (1965). Here the court did not make the definite determination required by law. For this reason we would be compelled to send the matter back to the trial court for a definite determination of voluntariness. State v. Simoneau, 98 Ariz. 2, 401 P.2d 404 (1965).

However, because the case must also be reversed on the additional grounds above stated, it is necessary to remand it for new trial. There are several other issues raised on the appeal which we need not discuss, as they are unlikely to recur on a new trial.

Judgment reversed and remanded for new trial.

STRUCKMEYER, V. C. J., and BERN-STEIN, UDALL, and McFARLAND, JJ., concurring.