563 P.2d 315

The STATE of Arizona, Appellee,

v.

Joe Ruiz CANEDO, Appellant.

No. 2 CA–CR 858.

Court of Appeals of Arizona,
Division 2.

March 1, 1977.
Rehearing Denied April 6, 1977.
Review Denied April 26, 1977.

Bruce E. Babbitt, Atty. Gen., by Russell Piccoli, Asst. Atty. Gen., Tucson, for appellee.

John M. Neis, Pima County Public Defender, by Charles L. Weninger, Asst. Public Defender, Tucson, for appellant.

## · OPINION

HOWARD, Chief Judge.

Appellant was convicted by a jury of voluntary manslaughter while armed with a gun and was sentenced to the Arizona State Prison for a term of not less than 20 years nor more than life.

The facts show that appellant went to the apartment of an acquaintance, Mollie Gallardo, who was a small-time heroin dealer. He remained there approximately one-half hour during which time he argued with Mollie, killed her and departed rapidly from the scene in his automobile. Seven hours later, in the early morning hours of the next day, appellant was driving his automobile when he was spotted by a police officer who pulled him over and arrested him for murder. The murder weapon was found in his automobile. He was taken to the police station, given his Miranda warnings, and chose to make statements to the police.

Appellant denied killing Mollie and denied being at her apartment when the homicide occurred. He did state, however, that he had gone to her apartment two days before the homicide and exchanged a stereo tape recorder for four papers of heroin. According to appellant, he was at home with his "common-law wife" at the time of the killing and later that evening went to a friend's wedding. He later told the police that he did not actually go to the wedding but went to the reception; also, that nobody had borrowed his car that evening nor had anybody borrowed his gun. When the police pointed out to appellant that Mollie's son and two other children had seen him and his car at the apartment at the time of the killing, and that the ballistics test showed that his gun was the murder weapon, appellant still steadfastly maintained that he was not there. He suggested to the police that they get Mollie's roommate, Pamela Crowe, and the children who identified him together and he would be able to demonstrate why he was being accused.

At trial, appellant finally admitted that he shot and killed Mollie but claimed he did so in self-defense. He testified as follows. He had known Mollie four months prior to the shooting. He had helped her move on two different occasions. Two nights before the homicide, appellant, who was on a methadone maintenance program, went to Mollie's apartment to exchange a stereo for heroin. She agreed to give him the equivalent of $80 for the stereo, or eight papers of heroin, but could only give him four papers at that time and was going to give him the other four two days later. Appellant took the four papers of heroin which he used that night. The day of the homicide he went back to the apartment to get the other four papers of heroin which Mollie had promised him. When he entered the apartment, appellant was armed with a revolver in his waistband because he had heard that Mollie had a gun and that her attitude was "getting a little out of hand". He knew that she had used a gun in the past and had pulled a gun on somebody. He also suggested as additional justification for carrying his revolver that he had rejected her sexual advances.

Appellant stated that after he entered the apartment an argument ensued over his attention to her roommate, Pam, and that

when he told Mollie to hurry up and give him the heroin, she told him to sit down because she wanted to talk to him. She first told him she was not going to give him the heroin because it was too strong and then said she did not have any. After she said she did not have any, she asked him, "What are you going to do, shoot me or something?" At that time she was sitting on the couch. Appellant stood up and made a gesture to leave whereupon Mollie reached for the coffee table and grabbed her gun which was in her purse. He then took out his revolver, pulled the slide back and released it in order to chamber a round, and fired at her. He did not remember how many shots he took, but remembered hearing her gun drop to the floor after he turned around and left. He got into his car and went "up to the mountain" to think. Later, he went to the wedding reception. He stated that he did not report this version to the police because he was scared.

After Mollie's body was discovered, the Tucson Fire Rescue Unit was called to the scene. They found the deceased lying on the floor on her back in front of the couch. The police arrived shortly thereafter and secured the premises. They found three bullet holes in the couch and the three slugs that made the holes.

A search of the apartment by police officers did not disclose any heroin nor was any weapon found. Two purses were found by the police officers. One was in the bedroom and one bearing the deceased's identification was found on top of a clothes hamper in a corridor. This purse also contained $175.44 in currency. Empty .22 caliber shell casings were found in the bedroom and bathroom together with several .22 caliber live rounds.

Although there was testimony that the apartment had been cleaned just before appellant's arrival, testimonial and photographic evidence show furniture overturned and articles strewn around in the apartment when the officers arrived.

Pamela Crowe arrived on the scene later in the evening and told the police officers that the stereo recorder which appellant had brought to the apartment in exchange for the heroin was missing as was Pamela's television set. She also said that a .22 caliber revolver was missing but the testimony is unclear as to how long this revolver had been missing.

One of the deceased's young nieces testified that on the day the killing took place the deceased had asked her where her gun was. The niece was not clear as to whether this happened before appellant arrived or when he was there.

Based upon the exit and entry wounds, the position of the bullet holes in the couch, and the location of the expended slugs, the pathologist who testified for the state was of the opinion that Mollie Gallardo was leaning back on the couch with her back against the cushions when she was shot.

Appellant's claims of error are directed to evidentiary rulings and refusal to give certain jury instructions.

## EVIDENCE OF UNCOMMUNICATED THREATS AND SPECIFIC ACTS OF VIOLENCE

■ When the evidence would justify the giving of an instruction on self-defense the following rules as to the admissibility of threats, reputation and specific acts of violence are applicable:

(1) Where it is questionable as to who was the aggressor, or where the state of mind of the defendant at the time of the affray is in issue under the claim of justification, the general reputation of the deceased in the community as a dangerous, turbulent and violent person may be shown. *State v. Griffin,* 99 Ariz. 43, 406 P.2d 397 (1965); *Lawrence v. State,* 29 Ariz. 247, 240 P. 863 (1925); *Mendez v. State,* 27 Ariz. 82, 229 P. 1032 (1924).

(2) Specific acts of violence toward third persons observed by the defendant or known by him prior to the homicide may be shown in order to show that defendant was justifiably apprehensive and that the decedent was of a violent and turbulent disposition. *State v. Young,* 109 Ariz. 221, 508 P.2d 51 (1973); *State v. Jackson,* 94 Ariz.

117, 382 P.2d 229 (1963); *Mendez v. State,* supra.

(3) Specific acts of violence not known by the defendant directed toward third persons relating to or growing out of the same transaction as the homicide or so proximate in time, place and circumstances as would legitimately reflect upon the conduct or motives of the parties at the time of the affray are admissible in order to show who was the aggressor. *Lepker v. State,* 40 Ariz. 186, 11 P.2d 351 (1932); *Murphy v. State,* 33 Ariz. 336, 264 P. 685 (1928); *Mendez v. State,* supra.

(4) Threats against and actually communicated to the defendant are admissible to show who was the aggressor and a reasonable apprehension of danger on the part of the defendant. *State v. Wallace,* 83 Ariz. 220, 319 P.2d 529 (1957); *Burgen v. State,* 32 Ariz. 111, 256 P. 111 (1927); *Campbell v. Territory,* 14 Ariz. 109, 125 P. 717 (1912).

There are no Arizona cases which have considered the admissibility of the victim's uncommunicated threats against the defendant. Two views on the subject can be found in the annotation in 98 A.L.R.2d 6 at p. 15, et seq. Some cases hold such evidence inadmissible, reasoning that since the threats were unknown to the defendant at the time of his alleged criminal act, they could not have influenced him, and could have had no bearing on the reasonableness of his fears or apprehension for his life or personal safety at the time of the homicide. More recent cases have held that where the evidence presents a doubt or conflict as to who was the aggressor, evidence of the victim's uncommunicated threats against a defendant asserting that he acted in self-defense is admissible for the purpose of assisting the jury in determining who was the aggressor. Some courts expressly indicate that evidence of uncommunicated threats is admissible only for such purpose.[1]

Sally Nelson, a neighbor of the deceased, testified that the night before the shooting Mollie came to her apartment to borrow a flashlight. Mollie remained inside while Sally went to get the flashlight. When she came out with the flashlight, she saw Mollie standing under a staircase pointing a revolver at her. The court refused to allow her to testify that when she asked Mollie what the matter was, "She said she was going to kill a cabron." Appellant sought to admit this evidence to show Mollie's character and state of mind.

Assuming, but not deciding, that Arizona would adopt the view of the more recent cases, we find that the court did not err in rejecting the evidence. There was testimony that the word "cabron" is equivalent to "son of a bitch." Appellant stated that Mollie had once referred to him as a "cabron". There is authority for the view that evidence of the deceased's uncommunicated threats against a specific, but unnamed, person is admissible as bearing on the question of self-defense in a homicide prosecution, where it is shown that such threats bore reference to the defendant. *Warrick v. State,* 125 Ga. 133, 53 S.E. 1027 (1906); *Young v. Commonwealth,* 19 Ky.L. Rptr. 929, 42 S.W. 1141 (1897); *McCandless v. Commonwealth,* 170 Ky. 301, 185 S.W. 1100 (1916); *Muse v. State,* 158 Miss. 449, 130 So. 693 (1930); *State v. Whitworth,* 47 Mont. 424, 133 P. 364 (1913). Other than the fact that Mollie had once referred to him as a "cabron", there was no other testimony which would show that the threat bore any reference to appellant.

Frances Masengill, called as a defense witness, testified that she was a friend and neighbor of Mollie. She stated that about five days before Mollie was shot, Mollie told her that she had a gun. She appeared upset at the time, according to the witness, and attempted to find the gun but could not. The trial court refused to let this witness testify that she had heard that Mollie had fired a few shots into the air in the apartment parking lot, that she had heard that Mollie had tried to commit sui-

1. See cases cited in Annot. 98 A.L.R.2d at pp. 26–30. And see 1 Wharton's Criminal Evidence, 13th Edition § 207.

cide and that Mollie was upset the week before her death "with everything that was going on around here." As to the parking lot incident and the suicide attempt, such proffered evidence was clearly hearsay and not admissible. The testimony concerning the fact that Mollie was upset the week before her death was not relevant and the court did not err in excluding it.

■■ Manuel Montano, a close friend of appellant who testified at the trial, was not permitted to testify that two weeks before her death Mollie had shown him a .25 automatic pistol which she said she had just acquired. Appellant contends the court erred in rejecting this evidence since it would have indicated that Mollie was armed shortly before her death and would have been relevant to show her violent and turbulent character. We do not agree. Except for Montano's offered testimony all the evidence at trial indicated that if Mollie did have a weapon, it was a .22 revolver. Error, if any, in rejecting evidence of the possession of the .25 automatic pistol would be harmless beyond a reasonable doubt since Sally Nelson had already testified that the night before the killing Mollie had a revolver. Furthermore, possession of a weapon does not mean that the possession is of a violent and turbulent character.

■■ Although the trial court refused to permit Mr. Montano to testify as to the .25 automatic pistol, the prosecutor asked him if he had ever seen Mollie in possession of a .22 revolver. Appellant claims that this question was extremely prejudicial because it left the impression that Montano had never seen Mollie armed. We do not agree. First of all, whether he had ever seen Mollie armed is of little consequence because there was already sufficient evidence that at one time or another she possessed a .22 revolver. Furthermore, there was a question as to whether or not she was armed with or had a .22 revolver in the apartment at the time of the killing.

## REJECTION OF INSTRUCTIONS

■■ The court refused to give appellant's requested instruction No. 1 which defined the term "reasonable doubt". Instead it gave criminal standard No. 6 from Recommended Arizona Jury Instructions (RAJI). The committee comment on criminal standard 6 indicates that it did not define the term "reasonable doubt" because it felt that the evidence indicates that efforts to enlighten the jury concerning the meaning of the term have been ineffective. We agree with the committee and with criminal standard No. 6. We do not believe that the failure to define the term constituted error.

■■ Appellant contends the court erred in failing to give an instruction to the jury that in deciding whether the defendant acted from a reasonable belief of personal fear, the jury could take into account his knowledge of the violent, turbulent and dangerous character and disposition of the deceased. We note that the only objection made to the failure of the court to give the instruction was that it is a "statement of the law." Since this objection fails to state specific grounds, appellant has waived his right to complain on appeal. *State v. Whitaker,* 112 Ariz. 537, 544 P.2d 219 (1975).

Lastly, appellant claims the court erred in failing to give the following requested instruction:

"If the evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt, and the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence and reject the other which points to his guilt."

■■ This is the second half of the circumstantial evidence instruction which was condemned by our Supreme Court in *State v. Harvill,* 106 Ariz. 386, 476 P.2d 841 (1970). The court did not err in refusing to give it.

Affirmed.

HATHAWAY and RICHMOND, JJ., concur.