144 Ariz. 490 (1984)
698 P.2d 735
The STATE of Arizona, Appellee,
v.
Ricky Tyrone LAMAR, Richard R. Brown, and Lonnie Hayes, Appellants.
No. 2 CA-CR 3187.
Court of Appeals of Arizona, Division 2.
November 30, 1984.
Review Denied March 12, 1985.
As Corrected June 7, 1985.
*491 Robert K. Corbin, Atty. Gen. by William J. Schafer III and Stanley L. Patchell, Phoenix, for appellee.
James K. Kerley, Sierra Vista, for appellant Lamar.
Joseph J. DeFrancesco, Sierra Vista, for appellant Brown.
*492 Armand Salese, Tucson, for appellant Hayes.
Carla Ryan, Tucson, for appellants.
OPINION
HOWARD, Judge.
The charges in this case arose out of a riot which occurred at Buena High School in Sierra Vista, Arizona. Fifteen persons, all black and all members of the Christ Miracle Healing Center Church located in Miracle Valley, Arizona, were originally charged with various offenses. However, only five persons went to trial. Of these five, two were found innocent of all charges. Appellant Lamar was found innocent of participating in a riot and of the crime of unlawful assembly but was found guilty of disorderly conduct and assault on a peace officer. He was sentenced to two years' probation plus thirty days in the county jail on the assault charge.
Appellant Brown was found not guilty of participating in a riot and unlawful assembly, but guilty of resisting arrest, disorderly conduct, robbery, using or threatening to use a deadly instrument (a baton) and fleeing and attempting to elude a pursuing official law enforcement vehicle while driving a motor vehicle. He was sentenced to a prison term of 5.25 years for the robbery, one year for the unlawful flight, .9 of a year for resisting arrest and two years of unsupervised probation for the disorderly conduct, all sentences to run concurrently.
Hayes was found not guilty of loitering, guilty of disorderly conduct and guilty of assault with a dangerous instrument (a baton) on a peace officer and sentenced to concurrent terms of 3.75 years' imprisonment for the assault and two years' probation for the disorderly conduct.
The facts considered in the light most favorable to sustaining the jury verdict are as follows. The incident began when Lonnie Hayes, who had been expelled from Buena High School, came onto the campus, without authorization, accompanied by appellants Brown and Lamar. Brown and Lamar stayed out in Brown's automobile and Hayes went into the cafeteria where he was seen by the principal, Mr. Bergman, talking to two girls. Bergman asked Hayes to leave the campus, and Hayes went out the cafeteria door. Bergman and the assistant principal, Mr. Sandoval, subsequently checked to see if Hayes had left the campus and found that he had not done so, but was at the car with Lamar and Brown. After some difficulty with Hayes, Bergman and Sandoval succeeded in getting Hayes to start walking off the campus. Bergman then went to call the Sierra Vista police and told them that Hayes had been back on campus and if he returned he wanted Hayes arrested for trespassing and loitering.
Officers Walker and Plum responded to the call from the high school, each in a separate vehicle. Officer Plum checked with the administration office and then drove along the campus where he saw Officer Walker talking to Richard Brown and other occupants of the Brown vehicle. Plum went over to assist Walker. Ricky Lamar then came by and was talking to Walker in a very agitated mood. After some sarcastic remarks were said by Lamar to the officers, Lamar apparently spotted Lonnie Hayes coming along and shouted to Hayes to run. Then Lamar and a crowd of Miracle Valley blacks gathered around Officer Plum. By that time Bergman and Sandoval had arrived on the scene. Plum asked Bergman if there were any non-students in the crowd and Bergman indicated the occupants of the car and asked Plum to remove them from campus. Plum asked them to leave and Lamar said, "You and who else is going to make me leave." He then pushed Plum in the chest and Plum did the same to Lamar.
Bergman and Sandoval were trying without success to get the students to leave. Bergman seized Lamar, escorted him off the campus and asked him to leave, explaining that the school officials did not want any trouble. Plum returned to his car and Sandoval told Plum that he had heard a student say, "If they take one of us they will have to take all of us," and *493 suggested that Plum get some backup help. Plum got his night stick and he and Walker went up the street to arrest Lamar. As they approached Lamar, they told him he was under arrest but Lamar continued walking with the other blacks from Miracle Valley surrounding Lamar to prevent the officers from arresting him. When Walker tried to reach into the crowd to grab Lamar, the blacks jumped Walker and someone wrestled him into a ditch. When Plum went to Walker's aid, one of the blacks jumped Plum and took his night stick. Another officer, Randall, had arrived on the scene and he too was jumped by one of the blacks. At one point Lamar jumped down on Officer Walker, who was struggling with another black. Officer Randall, who held a headlock on a black girl who had jumped him, was struck by Hayes with a night stick and knocked unconscious. Ricky Brown came into the fray waving a night stick and he and Lamar went down the street which by then was lined up with traffic. Brown and Lamar approached a green Datsun. Lamar, with night stick in hand, threatened the driver of the car, pulled him out of the car, and Lamar and Brown sat in the front seats.
They were subsequently joined by Hayes. Brown then drove off toward Miracle Valley, pursued by two police units. The chase reached the speed of 90 miles per hour and at one point Brown rammed the Datsun into the side of one of the law enforcement vehicles and ran a roadblock. Appellants subsequently were arrested in Miracle Valley.
All three appellants took the witness stand. Lamar admitted that he jumped on top of Officer Walker and admitted to being in the Datsun during the chase. Brown admitted, inter alia, his commandeering of the vehicle and his involvement in the flight. Hayes admitted hitting Randall with a night stick but said he did so because Randall's headlock was choking the girl.
At trial, Armand Salese represented Jerome Pipkins, who was acquitted, and appellant Hayes. James Kerley represented appellant Lamar. Joseph DeFrancesco represented Antony McKinnley who was acquitted, and appellant Brown.
Appellants present the following alleged errors:
I. The trial court failed to determine that no conflict of interest existed because of the joint representation of the defendants, and the defendants' 6th and 14th amendment rights were thereby violated.
II. It was a denial of the defendants' due process rights not to appoint an investigator to assist the defense lawyers in preparing this matter for trial.
III. The attorneys should have been permitted to conduct individual voir dire in order to probe more deeply into the jurors' attitudes and backgrounds so that the attorneys could exercise their peremptory challenges more intelligently because of the racial and publicity aspects of this case.
IV. The trial court erred in not allowing the defense to present evidence regarding the prior conduct of the law enforcement officials when a prima facie showing of self-defense and protection of others had been made.
V. The trial court erred in admitting evidence of prejudicial incidents involving Lonnie Hayes which did not amount to crimes.
VI. The court erred in not permitting the defense to confront a key state witness with a prior inconsistent statement, in violation of defendants' 6th amendment rights.
VII. Duress and mistake of fact were reasonably supported by the evidence; therefore, it was error not to give the jury instructions on these theories of the case.
VIII. It was error not to dismiss this case because of the government's selective or discriminatory prosecution of the defendants.
JOINT REPRESENTATION
Although counsel for appellants did not object in the trial court to joint representation *494 nor did they bring to the attention of the court any conflict of interest, appellants contend that the trial court erred by failing to determine, sua sponte, that no conflict existed in the joint representation of the defense. We do not agree. The constitutional right of a defendant in a criminal case to effective assistance of counsel is essentially denied where counsel is forced to represent another whose interests conflict with those of the defendant. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). However, joint representation is not per se violative of constitutional guarantees of effective assistance of counsel. Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). In Holloway, the United States Supreme Court, quoting Justice Frankfurter in Glasser, noted that in some cases representation of multiple defendants might not only be appropriate, but advantageous:
"`Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack.'" 435 U.S. at 482, 98 S.Ct. at 1178, 55 L.Ed.2d at 433.
While recognizing that the ABA Project on Standards Relating To The Administration Of Criminal Justice, The Function Of The Trial Judge, § 3.4(b), p. 171 (1974) states that the trial judge should inquire into potential conflicts whenever there is joint representation, the Court declined to decide whether it would follow that standard because in Holloway the potential conflict of interest had been brought to the attention of the trial court. See 435 U.S. at 483, 98 S.Ct. at 1178.
Two years later the Court decided Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). In Cuyler the court decided the issue reserved in Holloway, whether a state trial judge must inquire into the propriety of multiple representation even though no multiple party lodges an objection. The court decided that such inquiry was not necessary, stating:
"Holloway requires state trial courts to investigate timely objections to multiple representation. But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case. Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. [footnote omitted] Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. Indeed, as the Court noted in Holloway, supra, at 485-486, 55 L.Ed.2d 426, 98 S.Ct. 1173, trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. `An "attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or probably will develop in the course of a trial."' [citation omitted] Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry. [footnote omitted] * * *
In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance...." [footnote omitted] 446 U.S. at 346-48, 100 S.Ct. at 1717-18. 64 L.Ed.2d at 345-47.
Appellants here have not borne their burden of demonstrating that an actual conflict of interest adversely affected their lawyers' performance. In fact, they have not shown and the record does not demonstrate even the slightest possibility of a conflict of interest. Defendants were as united at trial as during their actions towards the police. They have failed to establish a constitutional or a factual predicate for their claim of ineffective assistance of counsel.
*495 APPOINTMENT OF AN INVESTIGATOR
Appellants contend that the trial court erred in refusing to grant a request for investigators and to pay the expenses of their expert witnesses.
The record shows that appellants wanted the court to pay for two psychologists to examine appellants for a character trait known as "Black Rage." This character trait apparently causes blacks to react in a certain way against white police officers because blacks judge the actions of a police officer in a manner different from others, thereby allegedly rendering reasonable their actions in this specific case. They also requested an investigator on the ground that the state's disclosure contained 800 pages and there were 50 witnesses. Further, they wanted to hire an expert witness to testify that the use of a carotid chokehold was deadly. In addition, they wanted the court to pay for a witness to testify to the fact that Buena High School is not school property, but rather land owned by the State of Arizona. The trial court denied all the requests. Appellants do not contend that the trial court erred in denying the expert to testify as to the carotid headlock or as to the ownership of the school property. They confine their appeal to the denial of an investigator and to the failure to appoint the psychologists.
The record shows that the attorneys paid for the two psychologists out of their own pockets and that the psychologists did testify at trial. Assuming arguendo that such testimony was relevant, there can be no prejudice requiring a reversal of this case merely because the lawyers had to pay for the expert testimony.
As for the investigator, appellants have not shown us in any way what specific investigation would have been made or how they were prejudiced by not having an investigator. The Arizona statute on the appointment of experts for indigent defendants, A.R.S. § 13-4013(B), applies to capital offenses only. Constitutional considerations may mandate the appointment of an investigator in other cases, however, if the denial would substantially prejudice the defendant. State v. Peeler, 126 Ariz. 254, 614 P.2d 335 (1980). The decision in non-capital cases is within the sound discretion of the trial court and will not be overturned on appeal unless the appellant clearly establishes substantial prejudice. We find no abuse of discretion.
VOIR DIRE OF THE JURY
Appellants contend that the court failed to conduct a sufficient voir dire of the jury because it refused to ask the jury the questions which they submitted. The proposed questions included: "[H]ave you ever used the word `nigger'?" "Do you think that most white people are prejudiced against black people?" "Do you believe that over the last 10 years whites and blacks have been afforded essentially the same rights and privileges in our society?" Instead, the trial judge himself conducted the voir dire of the jury on the issue of racial prejudice. He asked them if they had attended integrated schools and if their experiences in such schools were good or bad. He also asked them whether they had any trouble in school due to integration. He asked how many of them lived in integrated neighborhoods and if they had experienced any problems as a result, whether they had any prejudice against the defendants because they were black, whether they objected to affirmative action programs or had been adversely affected by them, and whether they had seen television coverage of a certain incident which occurred in Miracle Valley involving the inhabitants of Miracle Valley and the police. All the foregoing questions were asked of the panel as a whole. The panel was then broken down into groups of five and they were asked again whether they knew about the incident at Miracle Valley and, if so, whether that affected their feelings toward blacks.
The mere fact that the victim of a crime by a black is a caucasian does not constitutionally mandate the trial judge to voir dire the jury about racial prejudice. See Rosales-Lopez v. United States, 451 *496 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1980); Ristaino v. Ross, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); and see Annot. 94 A.L.R.3d 15 (1979). In the instant case, appellants were members of a black church in a community located in Cochise County approximately 100 miles from Tucson, the site of the trial. A recent disturbance between the blacks and the police in Miracle Valley had been shown on Tucson television. This prompted the trial judge to question the veniremen about their knowledge of the incident and its effect on them. The televised incident, coupled with appellants' defense of "Black Rage", created racial overtones in the case which we believe required the trial judge to question the jurors about racial prejudice. It did so. The trial court may properly impose limitations upon the extent of the inquiry and such limitations will generally be held not to constitute an abuse of discretion. See State v. Valencia, 118 Ariz. 136, 575 P.2d 335 (App. 1977); Powell v. State, 53 Ala.App. 30, 297 So.2d 163 (1974) and see Annot. 94 A.L.R.3d 15, § 5(A), 39-41. We believe the trial judge's voir dire was sufficient to meet constitutional standards.
PRIOR CONDUCT OF LAW ENFORCEMENT OFFICERS
Appellants contend that the trial court erred in not allowing appellants to introduce into evidence an incident which occurred prior to the incident in question. A father, a non-member of the Miracle Valley Church, filed a habeas corpus proceeding in Cochise County to obtain custody of his daughter, Lora Triplett, a church member. The court ordered the daughter into custody. The sheriff's department picked Lora up at school without first contacting the school and requesting that Lora come in on her own. Appellants contended that this type of police overreaction whenever Miracle Valley residents were involved helped to explain defendants' state of mind and validated their defenses. The trial court denied admission of this evidence on the ground that the defenses of self-defense and defense of others were not relevant and that the probative value of the evidence would be outweighed by its prejudicial effect.
Appellants also contend that they established the defenses of self-defense and defense of others and that testimony about this incident was admissible to show reputation for belligerence, aggressiveness and quarrelsomeness, thus validating their contention they had a reasonable apprehension of danger. See State v. Wallace, 83 Ariz. 220, 319 P.2d 529 (1957); State v. Griffin, 99 Ariz. 43, 406 P.2d 397 (1965).
The difficulty with this argument is, first of all, that the conduct of the sheriff in the Triplett matter does not demonstrate violent or quarrelsome conduct which would cause somebody to apprehend apparent imminent danger to himself or to anyone else. Second, the Sierra Vista police force was not involved in the Triplett affair and the conduct of the sheriff's department was irrelevant to this case.[1]
EVIDENCE OF PRIOR MISCONDUCT
The state was allowed to show that Lonnie Hayes, while he was a student at Buena High School, had his bus privileges suspended for two weeks. Upon his first day back on the bus after the suspension, the bus driver again complained about Hayes' conduct on the bus and this time his privileges were revoked for the remainder of the year. The day that this revocation took place, Hayes got back on the bus. School officials asked him to leave and when he refused to do so the police were called. Hayes got off the bus and stood on an embankment haranguing the officers. A scuffle took place between Hayes, the police and some other Miracle Valley students who were on the bus and Hayes was expelled from school the next day. Appellant Hayes contends that this evidence had no *497 probative value and that the court committed reversible error in admitting it. We do not agree.
Evidence of other crimes, wrongs, or misconduct, is not admissible to prove the character of a person in order to show that he acted in conformity therewith. Rule 404(b), Rules of Evidence, 17A A.R.S. However, evidence of prior bad acts, another offense or misconduct, is admissible to show the complete story even though other prejudicial facts are revealed thereby. State v. Johnson, 121 Ariz. 545, 592 P.2d 379 (1979). This evidence was admissible to show why the school officials acted as they did in regard to Hayes. It explains why he was expelled and why Mr. Bergman reported the incident to the police and requested that Hayes be arrested if he came back on campus.
FAILURE TO ALLOW IMPEACHMENT
Appellants contend that the trial court refused to allow them to impeach Mr. Sandoval with a prior inconsistent statement. This is not correct. The record shows that the trial court did allow such evidence to be admitted but only refused to allow the written document itself into evidence. Appellants' claim of error is without basis.
FAILURE TO INSTRUCT ON DURESS AND MISTAKE OF FACT
Appellants testified that they believed their lives were endangered by the Sierra Vista police and that the police were out to get them. They contend that this evidence entitled them to an instruction on duress and mistake of fact. We do not agree.
A.R.S. § 13-412(A) states:
"Conduct which would otherwise constitute an offense is justified if a reasonable person would believe that he was compelled to engage in the proscribed conduct by the threat or use of immediate physical force against his person or the person of another which resulted or could result in serious physical injury which a reasonable person in the situation would not have resisted."
The defense of duress is not available as a substitute for self-defense. Duress envisions a third person compelling a person by the threat of immediate physical violence to commit a crime against another person or the property of another person. LaFave and Scott in their work, "Criminal Law", at 374-75, discuss the defense of duress and give the following example:
"... If A, armed with a gun, threatens B, a taxicab driver, with death unless B drives him to the scene of a robbery planned by A, B is not guilty of the robbery which A commits at the scene, because it is better for society as a whole that B do the lesser harm (aid A in the robbery) than that B's life be lost."
There was no evidence of any duress in this case.
Appellants also contend that if they mistakenly believed that the police officers were going to harm them, such a mistaken belief justified their conduct under A.R.S. § 13-204(A), which states:
"Ignorance or mistaken belief as to a matter of fact does not relieve a person of criminal liability unless:
1. It negates the culpable mental state required for commission of the offense; or
2. It supports a defense of justification as defined in chapter 4 of this title...."
In this case, there is no separate defense of mistake of fact. The concept of the defense which appellants contend supports an instruction on mistake of fact was embodied in the instruction given by the trial court on justification, which told the jury that in the case of self-defense and the defense of third persons appellants would be justified in using physical force in defense of themselves or in defense of third persons if a reasonable person in their situation would have believed that physical force was immediately necessary to protect either them or third persons from another's use or attempted use of physical force.
*498 SELECTIVE PROSECUTION
Appellants contend that the trial court erred in not dismissing the case because of the government's selective or discriminatory prosecution of appellants. In order to establish a prima facie case of discriminatory and selective prosecution it was incumbent upon appellants to show (1) unequal treatment of an offender similarly situated and (2) that the unequal treatment was based on bad faith. United States v. Berrios, 501 F.2d 1207 (2nd Cir.1974). There was absolutely no evidence of selective prosecution presented and the trial court did not err in refusing to dismiss the charges.
Affirmed.
BIRDSALL, C.J., and HATHAWAY, J., concur.
NOTES
[1] In disposing of this issue in this way, we do not mean to imply that appellants had a valid defense of self-defense or defense of others. In this respect, see State v. Williams, 132 Ariz. 153, 644 P.2d 889 (1982).