703 P.2d 464

**STATE of Arizona, Appellee,**

v.

**William BRACY, Appellant.**

No. 5809.

Supreme Court of Arizona,
En Banc.

June 10, 1985.

**524**

Robert K. Corbin, Atty. Gen., William J. Schafer, III, Chief Counsel, Crim. Div., Gerald R. Grant, Asst. Atty. Gen., Phoenix, for appellee.

J. Douglas McVay, Phoenix, for appellant.

GORDON, Vice Chief Justice:

On December 24, 1982 a jury found defendant, William Bracy,[1] guilty of one count of conspiracy to commit first degree murder, two counts of first degree murder, one count of attempted first degree murder, three counts of kidnapping, three counts of armed robbery, and one count of first degree burglary.

Defendant was subsequently sentenced to death for each count of first degree murder, to life imprisonment for conspiracy to commit first degree murder, and to approximately 140 years for the other crimes. This Court has jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 13–4031. We affirm the convictions and sentences.

The facts, viewed in the light most favorable to upholding the verdict, show that Pat Redmond and Ron Lukezic were partners in a successful printing business called Graphic Dimensions. In the summer of 1980, Graphic Dimensions was presented with the possibility of some lucrative printing contracts with certain hotels in Las Vegas. These deals fell through, however, when Pat Redmond and perhaps Ron Lukezic vetoed the idea.

In September of 1980, Robert Cruz asked Arnold Merrill if he would kill Pat Redmond for $10,000. Merrill declined. Cruz wanted Redmond killed in order to get Redmond's interest in Graphic Dimensions. Cruz ultimately planned to have Ron Lukezic killed as well and take complete control of Graphic Dimensions. In early December of 1980, Cruz and Merrill went to the Phoenix Airport and picked up defendant and Murray Hooper who arrived on a flight from Chicago. Cruz and Merrill then took defendant and Hooper to a hotel in Scottsdale, and Cruz gave defendant a key to one of the rooms.

---

1. In *State v. McCall*, 139 Ariz. 147, 677 P.2d 920 (1984), Mr. Bracy's last name was spelled "Bracey," and his name appears that way on some Illinois records. In the instant case, however, his name appears as "Bracy" on most records, and we will use this spelling here.

Defendant and Hooper stayed in the Valley for several days, during which time Merrill drove the two men to various locations. On one occasion, Merrill took defendant and Hooper to see Cruz, and Cruz gave defendant a stack of $100 bills, some of which defendant gave to Hooper. That same day Merrill, at Cruz's direction, took defendant and Hooper to a gun store owned by Merrill's brother, Ray Kleinfeld. Hooper picked out a large knife and defendant told Kleinfeld to put it on Cruz's account. Kleinfeld gave defendant a paper bag containing three pistols. Defendant, Hooper, and Merrill subsequently drove to the desert, where defendant took target practice with the guns while Hooper rested in the back of Merrill's car. Defendant and Hooper later moved from the hotel into Merrill's house, where they met Ed McCall.

A few days later, defendant, Hooper, and Merrill followed Pat Redmond's car as Redmond left a bar. When they neared Redmond's car, Hooper attempted to shoot Redmond. The attempt failed, however, when Merrill, who was driving, intentionally swerved the car. Cruz, defendant, and Hooper were upset at Merrill for his actions. After the failed attempt, defendant and Hooper moved out of Merrill's home and into the apartment of Valinda Lee Harper and Nina Marie Louie, two women Merrill had introduced to defendant and Hooper. On December 8, 1980, McCall told Merrill he was "joining up" with defendant and Hooper. Defendant and Hooper returned to Chicago shortly thereafter.

Defendant and Hooper returned to Phoenix on December 30, 1980. On the evening of December 31, 1980 defendant, Hooper, and McCall went to the Redmond home and forced their way in at gunpoint. Pat Redmond, his wife Marilyn, and Marilyn Redmond's mother, Helen Phelps, were present. Defendant, Hooper, and McCall eventually herded the Redmonds and Mrs. Phelps into the master bedroom where they bound, gagged, and robbed them. After forcing the Redmonds and Mrs. Phelps to lie face down on the bed, one or all of the intruders shot each victim in the head. One of the intruders also slashed Pat Redmond's throat. Pat Redmond and Mrs. Phelps died from their wounds, but Marilyn Redmond lived.

Defendant was tried with Hooper. Marilyn Redmond provided the most damning evidence against defendant, stating that he and Hooper, along with McCall, forcibly entered her home and committed the murders. Arnold Merrill and several other witnesses tied defendant and Hooper to the conspiracy to kill Pat Redmond. Although admitting they were in Phoenix in early December, the defendant and Hooper maintained they had no part in the plot to kill Pat Redmond. Rather, they contended that Arnold Merrill and other local criminals, as part of a robbery ring, framed both defendant and Hooper for the murders which probably resulted from a robbery attempt. Defendant and Hooper also maintained that Mrs. Redmond misidentified them and that they were in Chicago on New Year's Eve of 1980.

Defendant raises a number of issues.

## I. PROSECUTORIAL MISCONDUCT

Defendant alleges that prosecutors Joseph L. Brownlee and Michael D. Jones, as well as their chief investigator Dan Ryan,[2] engaged in continuous misconduct denying defendant his right to a fair trial. The alleged instances of misconduct involve prosecutorial nondisclosure of evidence and misconduct exclusive of nondisclosure of evidence.

### A. Misconduct Exclusive of Failure to Disclose Evidence

Having reviewed the alleged instances of prosecutorial misconduct, we discuss the following, examining whether misconduct occurred.

■ First, in opening statement, the prosecutor stated that Nina Marie Louie

---

2. The trial judge evidently considered Dan Ryan as part of the prosecution team, imputing his misconduct to the prosecution. We agree. Mr. Ryan was employed by the County Attorney and he answered directly to Mr. Brownlee. Mr. Brownlee was responsible for his actions.

made positive pretrial identifications of both defendant and Hooper. The trial judge, however, had not yet decided whether those pretrial identifications were admissible, and he later ruled them inadmissible. Though allowing Louie to make in-court identifications of both defendant and Hooper, the trial court instructed the jurors to disregard the prosecutor's remarks concerning the pretrial identifications. As the trial court had not yet decided whether the pretrial identifications were admissible, the prosecutor's statements were baseless and improper.

Defendant next alleges misconduct in prosecutor Joseph L. Brownlee's appearance in the November 1982 issue of *Phoenix Magazine*.[3] On September 28, 1982 Mr. Brownlee and all other lawyers in this case agreed with the trial judge not to contact the media. Prior to this agreement, Brownlee voluntarily interviewed with a *Phoenix Magazine* reporter who desired a story on Brownlee and the Redmond murders. Brownlee discussed, among other things, where he was and what he was doing New Year's Eve of 1980 when he heard about the murders, how he then spent the entire night and part of the next day investigating the murders, how inspirational Mrs. Redmond had been, his philosophy of prosecuting, and his favorite past case. After the September 28th agreement, Brownlee posed for photos to accompany the article.

■ Even assuming the parties had not agreed to contact the media, Mr. Brownlee's actions were improper as a transgression of rules relating to trial publicity. *See* Rule 29(a), DR 7–107, Ariz.R.S.Ct. in effect at the time of the trial. In addition, by posing for photos to accompany the article after having agreed not to contact the media, Mr. Brownlee blatantly violated an agreement with the trial court. *See* DR 1–102(A)(4), (5); DR 7–106(B)(6). Mr. Brownlee's behavior was improper.

■ Defendant next alleges that county attorney investigator Dan Ryan allowed Arnold Merrill to go free of custody in violation of Maricopa County Jail regulations to visit his wife for sexual relations. The record at least reveals that Dan Ryan took Arnold Merrill out of jail to privately visit his wife. This action was certainly improper.

### 1) *Prejudice resulting from misconduct*

■ We now examine the prejudice resulting from the above three instances of misconduct. We will reverse a conviction only where the defendant has been denied a fair trial as a result of prosecutorial misconduct. *State v. Hallman*, 137 Ariz. 31, 668 P.2d 874 (1983); *State v. Moore*, 108 Ariz. 215, 495 P.2d 445 (1972). A defendant is denied a fair trial because of prosecutorial misconduct if there exists a reasonable likelihood that the misconduct could have affected the jury's verdict. *See State v. Tuzon*, 118 Ariz. 205, 575 P.2d 1231 (1978). Whether a reasonable likelihood exists that the misconduct could have affected the jury's verdict is left to the sound discretion of the trial court. *State v. Gonzales*, 105 Ariz. 434, 466 P.2d 388 (1970).[4]

We do not believe a reasonable likelihood exists that the misconduct affected the verdict. No prejudice resulted to defendant from Mr. Brownlee's improper opening statements concerning pretrial identification. The trial court prohibited Nina Marie Louie from testifying regarding the pretrial identifications. Immediately after allowing Louie to identify defendant in court, the trial court instructed the jury to disregard the prosecutor's statement regarding the pretrial identification. The trial court's curative instruction, therefore, nullified any prejudice defendant suffered from the prosecutor's improper statement. *See State v. Means*, 115 Ariz. 502, 566 P.2d 303 (1977) (in light of trial court's curative instruction, trial court did not abuse discre-

---

**3.** The trial in this matter began in late October of 1982.

**4.** The trial court denied numerous defense motions for mistrial based upon prosecutorial misconduct.

tion in refusing to order new trial because of prosecutor's improper closing argument).

Though we are disturbed by Mr. Brownlee's misconduct regarding trial publicity, we cannot say any prejudice resulted. After the article surfaced, the trial judge questioned all the jurors, determining that none of them had read it. In addition, the trial court ordered the jurors not to read the issue of the magazine in which the article appeared.

As to Dan Ryan's letting Arnold Merrill out of jail to privately visit his wife, we cannot say it caused prejudice to defendant. The defense brought the information to the jury's attention for the jury to use in judging Merrill's and Ryan's credibility. We find no abuse of discretion.

## B. Prosecutorial Nondisclosure of Evidence

Defendant alleges that numerous instances of prosecutorial nondisclosure of evidence warrant a new trial. Such nondisclosure concerns the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Rule 15.1, Ariz.R. Crim.P. 17 A.R.S., the codification of *Brady.*

### 1) Alleged Instances of Nondisclosure

Defendant alleges the following instances of prosecutorial nondisclosure of evidence: the untimely disclosure of a police report containing "horribly incriminating" statements attributed to defendant; the failure to disclose, until trial, Officer Perez's handwritten notes that were consistent with Mrs. Redmond's testimony regarding the description of the three assailants even though his police report contradicted her testimony; the suppression, until trial, of photographs of three black men arrested New Year's Eve of 1980 who were later released; the suppression, until trial, of police reports regarding the arrests of the three men on the 31st; and the failure to disclose benefits totaling $878.00 the prosecution gave to Nina Marie Louie in exchange for her testimony.

The next instance of prosecution suppression of evidence first came to light after trial. Both defendants moved to vacate judgment based on this evidence, and the trial court held hearings on this motion as a result of which the court found the following items had never been disclosed to defendant:

1) Prior to trial, Dan Ryan, county attorney investigator, made car payments for Arnold Merrill's wife, Cathy Merrill, totaling over $800.00 for which Ryan received only partial reimbursement;

2) Mrs. Merrill also received approximately $3,000 from the Maricopa County Attorney's Protected Witness Program;

3) Arnold Merrill made approximately twenty-two long distance phone calls from the county attorney's office, some of which were with Dan Ryan's knowledge, others of which Merrill made while left unattended in Ryan's custody, and none of which he paid for.

Although finding all of the above items a direct and significant benefit to the Merrills, the trial court refused to vacate judgment because independent reliable evidence tied defendant to the conspiracy and to the murders and because the undisclosed evidence was cumulative.

### 2) Propriety of New Trial Under Brady

■ The United States Constitution requires the prosecution to disclose to a defendant information that would tend to absolve the defendant of guilt or mitigate his punishment. *Brady v. Maryland, supra.* This disclosure requirement exists regardless of the good faith or bad faith of the prosecution. *Id; State v. Lukezic,* 143 Ariz. 60, 691 P.2d 1088 (1984).

■ As to five of the above instances of nondisclosure, we find no *Brady* violations. The police report containing "horribly incriminating information" was excluded from trial, and the witness through which the evidence was to be presented never testified at trial. Failure to disclose inculpatory evidence is not a *Brady* violation. *See United States v. Agurs,* 427 U.S.

97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland, supra.* In addition, as the evidence was never presented at trial, defendant could not have suffered any prejudice. The same rule applies to Officer Perez's notes, which were inculpatory in that they were consistent with Mrs. Redmond's trial testimony. *See, United States v. Agurs, supra; Brady v. Maryland, supra.*

■ Regarding the photographs of the three suspects arrested the evening of the murders, defense counsel objected to their admission, and the trial court excluded the photographs. Thus, either these photographs were not exculpatory or defense counsel did not want them in evidence for some other reason. As the trial court sustained the defense objection to admission of the photographs and ordered the jury to disregard any mention of them, defendant did not suffer prejudice from the nondisclosure of this evidence.

■ Regarding the police report concerning the three persons arrested New Year's Eve and the agreement with Nina Marie Louie, though all these items were exculpatory, this information came to light during trial and defendant made use of it. When previously undisclosed exculpatory information is revealed at the trial and presented to the jury, there is no *Brady* violation. *State v. Jessen,* 130 Ariz. 1, 633 P.2d 410 (1981).

■ As to the benefits Arnold Merrill received, we find that they were exculpatory in nature and were never disclosed to defendant. Having determined that the prosecution suppressed exculpatory evidence, we must next determine whether a new trial is warranted. The prosecution's failure to disclose exculpatory evidence to a defendant will result in a new trial when the suppressed evidence is material. *United States v. Agurs, supra, Brady v. Maryland, supra.* Absent an abuse of discretion, however, we will not disturb the trial court's denial of a new trial. *State v. Fisher,* 141 Ariz. 227, 686 P.2d 750 (1984).

We employ a sliding scale analysis in determining what level of materiality must be proven to establish that a *Brady* violation requires a new trial. See *United States v. Agurs, supra; Talamante v. Romero,* 620 F.2d 784, (10th Cir.1980), *cert. denied,* 449 U.S. 877, 101 S.Ct. 223, 66 L.Ed.2d 99; *State v. Lukezic, supra.* In *Agurs,* the United States Supreme Court announced three categories of undisclosed evidence requiring three different levels of materiality: first, in those cases in which the prosecution has knowingly used perjured testimony, the conviction must be set aside if there exists a reasonable likelihood that the false testimony could have affected the jury's verdict; second, where a pretrial request has been made for specific evidence, the judgment must be vacated if the suppressed evidence might have affected the outcome of the trial; and third, where there has been a general request for *Brady* material or no request at all, the test of materiality is whether "the omitted evidence creates a reasonable doubt [as to the defendant's guilt] that did not otherwise exist." *United States v. Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355; *Talamante v. Romero, supra; State v. Lukezic, supra.*

■ As there were specific defense requests for the undisclosed information concerning Arnold Merrill, the evidence fell under the second *Agurs* category. The defense filed a detailed discovery request demanding discovery of any benefits received by state witnesses in exchange for their testimony. As the undisclosed evidence in the instant case fits under the second *Agurs* category, the test for materiality is whether the suppressed evidence might have affected the outcome of the trial. *United States v. Agurs, supra; Talamante v. Romero, supra; State v. Lukezic, supra; see also,* 2 W. LaFave & J. Israel, *Criminal Procedure* § 19.5 (1984).

After carefully reviewing the record in the instant case, we find the suppressed evidence regarding benefits to Arnold and Cathy Merrill does not reach the level of materiality required by *Agurs.*

We so hold for two reasons. First, we find the undisclosed evidence merely cumulative. *See State v. Maddasion,* 130 Ariz. 306, 636 P.2d 84 (1981). The defense possessed and used a wealth of impeaching evidence against Arnold Merrill. Such evidence included Merrill's plea bargain with the state; his extensive drug use; his past participation in arson, burglary, kidnapping, and robbery; his past lies to police officers; and his private out-of-jail visit with his wife while being incarcerated for first degree murder. Though we find at least two of the undisclosed benefits somewhat unusual and improper, they do not approach the degree of seriousness of the undisclosed benefits in *State v. Lukezic, supra.* Thus, in view of the great wealth of impeaching evidence against Arnold Merrill showing both bad character and bias, we do not believe the disclosure of benefits equaling several thousand dollars would have had any effect upon the outcome of the trial.

Second and more importantly, the strong eyewitness testimony of Mrs. Redmond in combination with independent evidence of defendant's participation in the conspiracy is more than sufficient to uphold the convictions. Mrs. Redmond testified that defendant, Hooper, and McCall entered her home at gunpoint and killed her husband and mother. This evidence was particularly strong because Mrs. Redmond had ample opportunity to view all three men in her home. In addition, evidence apart from that presented through Merrill showed defendant's presence in Phoenix in early and late December, his connection to Robert Cruz, and his participation in Cruz's conspiracy to kill Pat Redmond.

Unlike *State v. Lukezic, supra,*[5] therefore, Arnold Merrill's testimony in the instant case was merely corroborative and not pivotal. Furthermore, the undisclosed information impeaching him and Dan Ryan had no effect upon the key testimony of Marilyn Redmond. Finally, unlike *Lukez-*

ic, falsifications of George Campagnoni's probation report were disclosed in the instant case, thus allowing the jury to fully judge his credibility. Campagnoni along with several other witnesses, exclusive of Arnold Merrill, provided important testimony linking defendant to the conspiracy. Thus, we do not believe that three additional pieces of impeaching information regarding Arnold Merrill might have affected the jury's belief in Mrs. Redmond and the other evidence. Nor would it have had any effect on whatever opinion the jury had of Merrill's credibility. *See also Schmanski v. State,* 466 N.E.2d 14 (Ind.1984). We find no abuse of discretion.

### 3) Propriety of a New Trial Under the Arizona Discovery Rules

### a) Whether a Violation of Arizona Discovery Rules Occurred

■ Rule 15.1, Ariz.R.Crim.P., 17 A.R.S., requires the prosecution to supply the defense a wide range of discovery material. We believe all of the above discussed non-disclosed evidence should have been made available to defendant. *See* Rule 15.1(a)(1) (relevant written or recorded statements of witnesses); (a)(2) (all statements of defendant and any person who will be tried with him); (a)(4) (photographs which prosecutor will use at trial); (a)(7) (all material which tends to reduce or negate defendant's guilt or punishment).

### b) Prejudice under the Arizona Discovery Rules

As with *Brady* violations, not every Rule 15.1 violation will cause a reversal. Imposition of sanctions under Rule 15.7 is within the sound discretion of the trial court. *State v. Stewart,* 139 Ariz. 50, 676 P.2d 1108 (1984). The trial court's choice of a sanction or no sanction will not be reversed on appeal absent a showing of prejudice. *State v. Jessen, supra.*

---

**5.** In *State v. Joyce Lukezic, supra,* the defendant was accused of participating in the conspiracy to kill Patrick Redmond. No direct evidence linked defendant to the crime. Rather, numer-

ous witnesses, most importantly Arnold Merrill and George Campagnoni, tied Lukezic to the conspiracy through hearsay evidence.

We find the trial court did not abuse its discretion and that defendant was not prejudiced by the prosecution's violations of Rule 15.1. As to the police report containing incriminating statements attributed to defendant, it was excluded from trial. Regarding the photographs of the three persons arrested New Year's Eve, the trial judge excluded them from evidence and ordered the jury to disregard any mention of them. Concerning Nina Marie Louie's agreement with the prosecution, both defense lawyers made use of this information as it was exculpatory. The same is true for the police reports detailing the arrests of the three persons the evening of the murder.

As to the more inculpatory evidence contained in Officer Perez' notes, the trial court ordered the prosecution to immediately furnish the defense with copies of the notes, thus allowing defendant to cross-examine Officer Perez regarding the conflict between his notes and his police report. Second, though the prosecution had previously failed to supply defendant with the notes, the existence and contents of the notes were revealed in the Cruz-McCall trial, the transcript of which defendant possessed. Thus, the substance of the notes was disclosed to defendant.

Finally, for the same reasons stated in our *Brady* analysis, we do not think the trial court abused its discretion by refusing to vacate judgment under the Arizona Rules of Criminal Procedure because of the undisclosed benefits to Arnold Merrill.

Though we find a new trial is unwarranted in the instant case, we wish to express our dissatisfaction with the conduct of the prosecution. In ruling on defendant's motion to vacate judgment, the trial judge made the following observations:

> "The Court further determines that a cavalier, almost holier-than-thou attitude existed on the part of some of the prosecution team as evidenced by the overreaching, 'I didn't think it mattered' blase at times, disinterested, its-none-of-your-business attitudes taken at various points during these entire proceedings.

> "These attitudes hampered the smooth processing of these matters during all stages and at all times caused unnecessary antagonisms between the prosecution and defense teams.

> \* \* \* \* \* \*

> "The Court is further disturbed by the fact that at every discovery and evidentiary gathering effort undertaken by the defense teams in these matters, new revelations of benefits bestowed upon Mr. Merrill or questionable conduct by a member or members of the prosecution team are revealed and require pursuit."

With their staggering caseload, the last thing courts need is prosecutorial conduct that causes cases to be extended to accommodate hearings that are not only unnecessary, but are distracting and expensive. We share the trial court's displeasure at the prosecution's disclosure policies in this case.

## II. PRETRIAL IDENTIFICATION

■ Defendant next contends that the trial court erred in finding that the pretrial identification procedure in which Marilyn Redmond identified defendant was not unduly suggestive. The fairness and reliability of a challenged identification are preliminary matters for the trial court, whose findings will not be overturned on appeal absent a showing of clear and manifest error. *State v. Schilleman*, 125 Ariz. 294, 609 P.2d 564 (1980); *State v. McGill*, 119 Ariz. 329, 580 P.2d 1183 (1978).

■ Criminal defendants have a due process right to a fair identification procedure. *State v. Myers*, 117 Ariz. 79, 570 P.2d 1252 (1977); *State v. Nieto*, 118 Ariz. 603, 578 P.2d 1032 (App.1978). Reliability is the key to determining the admissibility of identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. McCall*, 139 Ariz. 147, 677 P.2d 920, *cert. denied*, —— U.S. ——, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1983). *State v. Nieto, supra.* Thus, even if a pretrial identification is unduly suggestive, it is nonetheless admissible if the wit-

ness' identification is reliable. *Manson v. Brathwaite, supra. State v. McCall, supra.* Reliability is determined by considering the factors set out in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ Assuming, without deciding, that the lineup procedure was unduly suggestive, we find the identification reliable under the five *Biggers* factors.[6] First, Mrs. Redmond had ample opportunity to observe defendant at the time of the crime. After she first encountered defendant in the well-lighted laundry room, defendant led Mrs. Redmond through her house at gunpoint speaking to her several times. During this time Mrs. Redmond had no difficulty seeing defendant's face or body, and she also got a good look at him in her well-lighted bedroom.

During her encounter with defendant, Mrs. Redmond had a high level of attention. Though she was frightened to a certain degree, Mrs. Redmond stated that she was paying attention to the faces of all three intruders in the house. She was not just a casual observer of defendant, but rather her attention was focused on the suspect. *See State v. Ware,* 113 Ariz. 337, 554 P.2d 1264 (1976).

The accuracy of Mrs. Redmond's description was hotly contested at trial, with the defense arguing that Mrs. Redmond's first descriptions of her assailants indicated that three black men, two of whom were masked, were the murderers. Regarding the reference to three black males, we believe the evidence shows that, at the scene, Mrs. Redmond initially said all three men were black, but that she corrected herself, saying, "no, one was white." The record supports the inference that this discrepancy was caused by difficulties Mrs. Redmond had in communicating immediately following the gunshot wound to her head.

Furthermore, though some accounts indicate that Mrs. Redmond initially stated that one or two of the assailants wore masks, other testimony shows that Mrs. Redmond never mentioned masks following the crime. Mrs. Redmond herself never recalled mentioning masks, and her testimony indicated that none of the intruders wore masks. Her other initial descriptions of the two black men were not particularly detailed. Examining the totality of the circumstances regarding this factor, we do not find the discrepancies in the descriptions to be *per se* unreliable. *See State v. McCall, supra.*

Mrs. Redmond displayed a good level of certainty at the lineup. When she first viewed the lineup containing defendant, she did not immediately identify him. Rather, she left the room for a period of time and later returned. She then identified Hooper in a different lineup. She then requested that the first lineup be reassembled, at which time she quickly identified defendant. Mrs. Redmond testified that she had picked out defendant in her mind during the first lineup but that she wanted to verify his height. When she again saw him she said she was positive that defendant was one of the assailants. Thus, despite her initial hesitancy, we find Mrs. Redmond's level of certainty more indicative of reliability than not.

Mrs. Redmond's identification of defendant came fifty-three days after the crime. Whether the length of time between the crime and the pretrial identification is too long depends upon the facts of each case; there is no *per se* rule. *See State v. Strickland,* 113 Ariz. 445, 556 P.2d 320 (1976) (ten days too long where witness saw attacker for very brief moment and at a point in time where she had no discernible interest in remembering what perpetra-

---

6. We restated those five factors in *State v. McCall, supra:*

(1) the opportunity of the witness to view the criminal at the time of the crime,

(2) the witness' degree of attention,

(3) the accuracy of the witness' prior description of the criminal,

(4) the level of certainty demonstrated by the witness at the confrontation, and

(5) the length of time between the crime and the confrontation.

tor looked like); *State v. McCall, supra* (fourteen days not too long where victim had ample opportunity to observe attacker at time of crime and where victim gave detailed description of attacker). In the instant case, in light of Mrs. Redmond's ample opportunity to observe defendant at the time of the crime, her high level of attention at the time of the crime, and her good level of certainty at the lineup, Mrs. Redmond's identification of defendant fifty-three days after the crime was not unreliable.

Based upon the foregoing factors, we find no clear and manifest error in admitting evidence of Mrs. Redmond's pretrial identification of defendant.

### III. SHACKLING OF DEFENDANT

Prior to jury selection, the trial judge ordered that defendant wear leg, ankle, and waist restraints so long as his arms were not confined in front of the jury. Fearing the jury would see the shackles, defendant chose to waive his presence during voir dire. He maintains the trial court's actions denied him his right to be present under Ariz. Const. art. 2, § 24.

■■■ Whether a defendant will be shackled is within the sound discretion of the trial court. *State v. Stewart,* 139 Ariz. 50, 676 P.2d 1108 (1984); *State v. Reid,* 114 Ariz. 16, 559 P.2d 136 (1976), *cert. denied,* 431 U.S. 921, 97 S.Ct. 2191, 53 L.Ed.2d 234 (1977). Further, when a defendant objects to being shackled during trial, there must be support in the record for the trial court's decision. *State v. Stewart, supra.*

■■■ The record revealed that defendant had a long history of violent crime, at least one escape conviction, and was under three death sentences in Illinois arising from a triple first degree murder. Factors a trial court may consider in shackling a defendant include past felony convictions for crimes of violence as well as prior escapes. *State v. Stewart, supra; State v. Johnson,* 122 Ariz. 260, 594 P.2d 514 (1979).

■■ Here, the trial court took extensive precautions to assure that defendant's restraints would not be visible to the jury. *See State v. McMurtrey,* 136 Ariz. 93, 664 P.2d 637, *cert. denied,* —— U.S. ——, 104 S.Ct. 180, 78 L.Ed.2d 161 (1983) (appellate court will not find error on ground that defendant shackled unless it is shown jury saw shackles). In view of defendant's background, we do not think the trial court abused its discretion in ordering defendant to wear restraints the jury could not see. Thus, as defendant was properly restrained, he was not denied his right to be present when he voluntarily chose to be absent during voir dire.

### IV. LIMITATION OF CROSS-EXAMINATION

Defendant next argues that the trial court committed reversible error by limiting defendant's cross-examination of investigator Dan Ryan.

Mr. Ryan's investigatory techniques concerning the Redmond murders resulted in a contempt of court citation in the *State v. Joyce Lukezic* trial.[7] During the instant case, the defense brought to light many of the allegations of wrongdoing by Mr. Ryan. In reaction, the prosecution called Mr. Ryan as a rebuttal witness, and Mr. Ryan then denied any wrongdoing. Though allowing cross-examination about the factual basis supporting the contempt charge, the court prohibited the defense from mentioning the contempt charge. Defendant submits that the trial court's action denied him his right to confront and cross-examine witnesses guaranteed him by the sixth amendment to the United States Constitution and by art. 2, § 24 of the Arizona Constitution.

■■■ Defendants have a sixth amendment right to confront and cross-examine witnesses. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *State v. Dunlap,* 125 Ariz. 104, 608 P.2d 41 (1980). Furthermore, a witness' bias or self-interest may be shown by proving that

---

**7.** He was later acquitted of this charge.

the witness is under indictment and that the prosecution is responsible for prosecuting that indictment. See *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); McCormick on Evidence, § 40, at 87 (E. Cleary 3rd Ed.1984). We allow a broad scope of cross-examination, the unreasonable limitation of which will normally result in a reversal. *State v. Dunlap, supra.*

In the instant case we do not find an unreasonable limitation of the cross-examination right. First, the County Attorney prosecuting the instant case was not involved in prosecuting Mr. Ryan for contempt. Rather, a special, independent prosecutor had responsibility for prosecuting Mr. Ryan. Thus, the pending indictment would not have indicated that Mr. Ryan's testimony was colored by any hope of lenient treatment from the County Attorney. Second, the jury had before it ample evidence showing Mr. Ryan's bias and self-interest. Mr. Ryan was the prosecution's chief investigator answering directly to Mr. Brownlee, and the alleged instances of misconduct were serious. The jury could understand that he had bias and motives for testifying as he did. *See Skinner v. Cardwell,* 564 F.2d 1381, 1389 (9th Cir.1977) (test of reasonable limit on cross-examination is whether jury is otherwise in possession of sufficient information to assess the bias and motives of the witness). *See also United States v. Kelly,* 545 F.2d 619, (8th Cir.1976), *cert. denied,* 430 U.S. 933, 97 S.Ct. 1555, 51 L.Ed.2d 777 (1977); *United States v. Turcotte,* 515 F.2d 145 (2nd Cir. 1975), *cert. denied,* 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975).

## V. INFLAMMATORY PHOTOGRAPHS

Defendant next argues that the trial court committed reversible error in admitting inflammatory photographs because their prejudicial effect outweighed their probative value.

Inflammatory photographs may be admitted if they are relevant and if their probative value outweighs the danger of unfair prejudice attendant to their admission. *State v. McCall, supra; State v.*

*Chapple,* 135 Ariz. 281, 660 P.2d 1208 (1983). The decision to admit such photographs is within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent an abuse of that discretion. *State v. McCall, supra; State v. Clark,* 126 Ariz. 428, 616 P.2d 888, *cert. denied,* 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980).

In making its decision, the trial court must look to the purpose of the offer. *State v. Routhier,* 137 Ariz. 90, 669 P.2d 68 (1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984); *State v. Chapple, supra.* A trial court may admit photographs to prove the *corpus delicti,* to identify the victim, to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the state's theory of how and why the murder was committed. *State v. Chapple, supra; State v. Thomas,* 110 Ariz. 120, 515 P.2d 865 (1973). The purpose for the photograph's admission, however, must be an expressly or impliedly contested issue. *State v. Chapple, supra.* We find no abuse of discretion in the instant case.

In *State v. McCall, supra,* we considered seven of the same photographs admitted in the instant case. These photographs show Mrs. Phelps' wounds and Mr. Redmond's wounds. Four of the autopsy photographs were inflammatory. We, however, found that their probative value outweighed their prejudicial effect. Concerning two other autopsy photographs, we found them cumulative but not inflammatory and, therefore, not prejudicial. As to the seventh photograph depicting Patrick Redmond's body lying on the bedroom floor of his home, we found it inflammatory. We held, however, that it was relevant and that its probative value outweighed its prejudicial effect. The issues relating to these seven photographs are the same in the instant case as in *McCall.* Thus, for the reasons stated in *McCall,* the trial court in the

instant case did not abuse its discretion in admitting the photographs.

Defendant additionally objected to the admission of seventeen other photographs, only four of which are inflammatory and demand discussion. These are detailed depictions of the victims at the murder scene. The first is a closeup of Mrs. Phelps showing the bullet wound in her right cheek. It is not extremely bloody but is somewhat inflammatory. The next photograph is a detail of Mrs. Phelps' hands bound behind her back. Some blood smears are visible and the photograph is slightly gruesome. The next is a full view of the bedroom with Mrs. Phelps' body upon the bed and Mr. Redmond's on the floor. Though neither body appears in great detail, a large amount of blood appears on the bed. The photograph is inflammatory. The last photograph is a closeup of Mr. Redmond's face and chest. The bullet wound above his ear and his cut throat are clearly visible, a sock is stuffed in his mouth, and a great amount of blood covers his face and saturates his shirt. This photograph is clearly inflammatory.

█ Though the above four photographs are inflammatory to varying degrees, we hold that the trial court did not abuse its discretion in admitting them. First, these photographs gave the jury a complete view of the murder scene. By seeing closeups of faces, tied hands, and the gagged mouth in combination with photographs showing the location of the bodies, the jury could gain a full understanding of the murder scene, the identity of the victims, and how the murders were committed. These photographs alleviated the need for the jury to speculate as to these matters. *See State v. McCall, supra.*

Second, the photographs supported the state's theory of the case. The state alleged that these were premeditated, intentional, gangland-style contract killings. Though the less gruesome autopsy photographs tended to support this theory, *State v. McCall, supra,* the at-the-scene photographs provided the most convincing evidence of that theory. These photographs showed the binding, gagging, and the systematic method of killing, while the autopsy photographs show only the method of killing.

Finally, though defendant and Hooper offered to stipulate as to the identity of the victims and to the time, mode, manner, and cause of their deaths, such an offer of stipulation does not make the photographs inadmissible. An expressly and impliedly contested issue at trial was whether the murders were premeditated contract killings or whether they were murders committed by local criminals during a robbery attempt. The photographs support the contract murder theory. Further, despite defendant's stipulation, we cannot compel the state "to try its case in a sterile setting." *State v. Chapple,* 135 Ariz. at 289–90, 660 P.2d at 1216. Some of these photographs were gruesome, but the jury may see such photographs if they are relevant and more probative than prejudicial. We find no error.

## VI. PROSECUTORIAL COMMENTS IN CLOSING ARGUMENT

Defendant next argues that the prosecutor's final rebuttal argument contained impermissible references to defendant's failure to testify. The prosecutor stated:

"[MR. BROWNLEE:] Mr. Woods told you in his opening statement that Cruz and Merrill tried to get Bracy and Hooper involved in the South Phoenix drug deal and Bracy and Hooper said no, take a hike. You didn't hear any evidence to that effect."

█ The fifth amendment's prohibition against self-incrimination prohibits prosecution arguments that a defendant's failure to testify supports an unfavorable inference against him. *Lakeside v. Oregon,* 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978); *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *State v. Fuller,* 143 Ariz. 571, 694 P.2d 1185 (1985). Such conduct also violates a state statute, A.R.S. § 13–117(B), which has been

raised to the level of a constitutional guarantee. *State v. Fuller, supra.*

 Thus, under both Arizona and Federal law, an impermissible comment upon a defendant's invocation of his right not to testify occurs when "the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *United States v. Soulard,* 730 F.2d 1292, 1306 (9th Cir.1984); *State v. Fuller, supra.* The prosecutor, however, may properly comment upon the defendant's failure to present exculpatory evidence except when (1) the comment is phrased to call attention to the defendant's own failure to testify, or (2) it appears that the defendant is the only one who could explain or contradict the state's evidence. *State v. Fuller, supra; United States v. Soulard, supra; State v. Still,* 119 Ariz. 549, 582 P.2d 639 (1978).

 We find no violation of defendant's fifth amendment rights. The prosecutor's statement reflected the state's position that defendant failed to produce exculpatory evidence regarding a certain issue. It was not phrased to call attention to defendant's own failure to testify, nor does it appear from the record that defendant was the only one who could explain or contradict the state's evidence.

### VII. JURY INSTRUCTIONS

Defendant argues that three alleged errors in the giving of instructions denied him a fair trial.

 First, the trial court gave the following instruction without objection from either defense counsel:

"The state must prove the defendant's guilt beyond a reasonable doubt. If the evidence is susceptible of two equally reasonable interpretations, one of the defendant's guilt and the other of his innocence, it is your duty to adopt the interpretation of innocence."

Defendant now maintains that though he failed to object to the instruction, the giving of the instruction was fundamental error. Rule 21.3(c), Ariz.R.Crim.P.; *State v. Tison,* 129 Ariz. 526, 633 P.2d 335 (1981), *cert. denied,* 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). We find no fundamental error. The trial court's other instructions sufficiently informed the jury that it could not convict defendant if a reasonable doubt existed. This instruction could not have confused the jury. If anything, the instruction was advantageous to defendant, *see State v. Harvill,* 106 Ariz. 386, 476 P.2d 841 (1970); *State v. Canedo,* 115 Ariz. 60, 563 P.2d 315 (App.1977), vacated on other grounds, 125 Ariz. 197, 608 P.2d 774 (1980), and he could not have been prejudiced by it.

Next, defendant argues that the trial court committed reversible error by failing to provide the jury a definition of reasonable doubt until eleven hours after deliberations began. Though the court had intended to do so, it failed to give either a written or verbal definition of reasonable doubt. When the court realized its oversight, it reassembled the jury and read all the instructions, adding the reasonable doubt definition both verbally and in written form. The next day, the jury returned its verdicts. We find no error.

 First, though the trial court must always instruct the jury that the prosecution must prove its case beyond a reasonable doubt, there is no requirement that a trial court define reasonable doubt for the jury. The court, however, may do so if it sees fit. *State v. Hatton,* 116 Ariz. 142, 568 P.2d 1040 (1977); *State v. Canedo, supra; see also United States v. Miller,* 688 F.2d 652 (9th Cir.1982); *United States v. Witt,* 648 F.2d 608 (9th Cir.1981). Thus, even the total failure to define reasonable doubt could not have resulted in reversal. Second, the trial court eventually defined reasonable doubt for the jury, giving it both an appropriate written and verbal definition.

 Finally, defendant claims the trial court committed reversible error during the rereading of the instructions. Regarding

identification evidence, the trial court stated:

"If after examining the [identification] testimony you have a reasonable doubt as to the accuracy of the identification, you *may* [instead of must] find the defendants not guilty." (emphasis added).

Defense counsel pointed out the court's mistake, but the court declined to reread the instructions a third time stating that the jury had the correct law in written form.

We find no reversible error. The trial court had correctly read the same instructions to the jury the previous day, and the jury at all times had a written copy of the instruction with proper language. Reading the instructions as a whole, we do not believe the jury would have been mislead by the trial court's mistake. *See Kinsey v. State*, 49 Ariz. 201, 65 P.2d 1141 (1937); *see also* 75 Am.Jur.2d, *Trial* § 925 (1974).

### VIII. DEATH PENALTY ISSUES

#### A. Constitutionality

■ Defendant next argues that the Arizona death penalty is unconstitutional because (1) the jury takes no part in the sentencing determination; (2) A.R.S. § 13–703(B) gives the trial court no guidance as to what the mitigating factors are; (3) A.R.S. § 13–703 gives the trial judge no guidance on how to weigh mitigating factors against aggravating circumstances; (4) the death penalty is cruel and unusual; (5) the burden of proof is placed upon defendant with respect to mitigation; (6) the prosecutor has discretion to decide in which cases the death penalty will be sought; (7) Arizona has not adequately defined the terms "heinous, cruel or depraved"; and (8) Arizona law requires imposition of the death penalty when one aggravating circumstance exists and there are no mitigating factors.

We have previously considered and rejected all these arguments and do so again today. *See State v. Poland*, 144 Ariz. 388, 698 P.2d 183 (1985) (jury sentencing); *State v. Mata*, 125 Ariz. 233, 609 P.2d 48, *cert.*

*denied*, 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980) (what is a mitigating factor and how is it weighed); *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 298, 53 L.Ed.2d 1101 (1977) (death penalty not cruel and unusual); *State v. Richmond*, 136 Ariz. 312, 666 P.2d 57, *cert. denied*, —— U.S. ——, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983) (burden on defendant to show mitigating circumstances); *State v. Gretzler*, 126 Ariz. 60, 612 P.2d 1023 (1980), *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) (prosecutorial discretion); *State v. Ortiz*, 131 Ariz. 195, 639 P.2d 1020 (1981), *cert. denied*, 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982) (adequate definition of "heinous, cruel, or depraved"); *State v. Jordan*, 137 Ariz. 504, 672 P.2d 169 (1983) (death penalty not unconstitutional because it requires death sentence if one or more aggravating circumstances outweigh mitigating factors).

#### B. Propriety of the Death Sentence in This Case

As in all death penalty cases this Court independently reviews the record determining the existence and weight of aggravating circumstances and the propriety of the sentence. *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1985).

■ In imposing the death penalty, the trial court found five aggravating circumstances: A.R.S. §§ 13–703(F)(1), –703(F)(2), –703(F)(3), –703(F)(5), and –703(F)(6).

We find the existence of A.R.S. § 13–703(F)(1), that "defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable." On September 9, 1981, a judgment of conviction was entered and death penalty imposed against defendant in Cook County, Illinois for three counts of first degree murder.

We also find the existence of A.R.S. § 703(F)(2) that "defendant was previously convicted of a felony in the United States involving the use or threat of violence on

another person." On September 9, 1981 judgment was entered against defendant in Cook County, Illinois on three counts of armed robbery and three counts of aggravated kidnapping. We take judicial notice that all these crimes involve the use or threat of violence against others. *See State v. Nash, supra.*

■ We do not find the existence of A.R.S. § 13–703(F)(3) that "[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the victim of the offense." As we held in *State v. McCall, supra,* Marilyn Redmond was an intended victim of the crime, not a bystander in the zone of danger during defendant's murderous act. Her miraculous survival does not alter this fact. A.R.S. § 13–703(F)(3) has no application to this case. *See State v. McCall, supra.*

We find the existence of A.R.S. § 13–703(F)(5) that "defendant committed the offense as consideration for the receipt or in expectation of the receipt, of anything of pecuniary value." Arnold Merrill testified that Robert Cruz gave defendant a stack of $100 bills apparently as prepayment for the murders. Nina Marie Louie testified that Ed McCall told her the murders were contract killings. She also stated that defendant told her in early December that he had a big job to do that was "not very pretty" for which he would receive $50,000. In addition, Louie also testified that, shortly before the murders, all three assailants were armed with guns, and they were talking about coming into large amounts of money and doing an important job. This evidence is sufficient to establish that defendant was a hired murderer. A.R.S. § 13–703(F)(5) indisputably applies to this situation. *State v. McCall, supra; State v. Adamson,* 136 Ariz. 250, 665 P.2d 972, *cert. denied,* —— U.S. ——, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983).

Finally, we agree with the trial court that "defendant committed the offense in an especially heinous, cruel or depraved manner." A.R.S. § 13–703(F)(6).

■ Cruelty includes the infliction of physical pain or mental distress upon a victim. *State v. McCall, supra; State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983); *State v. Knapp,* 114 Ariz. 531, 562 P.2d 704 (1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). The defendant must intend or reasonably foresee that the victim will suffer because of defendant's acts. *State v. McCall, supra; State v. Adamson, supra.* In analyzing the instant facts we quote from *State v. McCall, supra,* whose identical facts and analysis are applicable here.

"The Redmonds and Mrs. Phelps were herded about the Redmond home at gunpoint by three men. After giving up their valuables, they were forced to lie down on a bed, had their hands taped behind their backs, and were gagged with socks. They knew that their captors were armed. [In addition, one of the attackers said 'we don't need these two anymore' immediately before the shooting started.] It may be inferred that [the victims] were uncertain as to their ultimate fate. *State v. Steelman,* 126 Ariz. 19, 612 P.2d 475 (1980). Except for the first victim, each of them had to endure the 'unimaginable terror' of having their loved ones shot to death within their hearing and then having to wait for their own turn to come. *State v. Gretzler,* 135 Ariz. at 53, 659 P.2d at 12. Such mental distress clearly constitutes cruelty. *State v. Gretzler, supra; State v. Steelman, supra.* In addition, expert medical testimony was given that Mrs. Phelps did not die from the first gunshot wound to her head, that she did not lose consciousness as a result thereof, and that she most certainly suffered pain from that wound. The infliction of such physical pain also clearly constitutes cruelty."

*State v. McCall,* 139 Ariz. at 161, 677 P.2d at 934.

■ The finding of A.R.S. § 13–703(F)(6) is also justified by two factors showing defendant's heinousness or depravity. The concepts of "heinousness"

and "depraved" involve the killer's vile state of mind at the time of the murder. *State v. McCall, supra; State v. Gretzler, supra.* Here, the murderers not only shot Pat Redmond twice through the head, but also slashed his throat at the time of his death or shortly thereafter. The infliction of gratuitous violence or the needless mutilation of the victim indicates depravity or heinousness. *State v. McCall, supra,* and cases cited therein. Additionally, the murderers killed Mrs. Phelps, an elderly houseguest of the Redmonds with no possible interest in their business affairs. Her murder in no way furthered the plan of the killers. Heinousness or depravity can be indicated by the senselessness of the crime or the helplessness of the victim. *State v. McCall, supra; State v. Zaragoza,* 135 Ariz. 63, 659 P.2d 22, *cert. denied,* 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983); *State v. Ortiz, supra.*[8]

The trial court also considered all possible mitigating circumstances but found none to exist. We agree. At the sentencing hearing, defendant took the stand and testified that he was not in Arizona on December 31, 1980 and that he never killed anyone in Arizona. The jury, of course, had previously found just the opposite to be true, and ample evidence supported the jury's verdict. Defendant's claim of innocence is not a mitigating factor in this case. Reviewing the record, we find no other mitigating circumstances.

In addition, we have reviewed this case in light of *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and find imposition of the death penalty proper. Though defendant had accomplices, the record contains sufficient evidence that defendant killed, attempted to kill, or intended to kill.

C. Proportionality Review

██ Lastly, this court examines prior cases to "determine whether the sentences

of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Nash, supra,* 143 Ariz. at 406, 694 P.2d at 236. Having examined other cases in which the defendant received the death penalty based on one or more of the aggravating circumstances found here, we find imposition of the death penalty not disproportionate. *See State v. Harding,* 141 Ariz. 492, 687 P.2d 1247 (1984); *State v. Fisher,* 141 Ariz. 227, 686 P.2d 750, *cert. denied,* —— U.S. ——, 105 S.Ct. 548, 85 L.Ed.2d 436 (1984), *State v. McCall, supra; State v. Adamson, supra; State v. Woratzeck,* 134 Ariz. 452, 657 P.2d 865 (1982).

We have also examined cases in which the death penalty was reduced to life imprisonment. *See, e.g., State v. Graham,* 135 Ariz. 209, 660 P.2d 460 (1983); *State v. Valencia,* 132 Ariz. 248, 645 P.2d 239 (1982). We believe imposition of the death penalty is justified.

Pursuant to A.R.S. § 13–4035 we have examined the entire record for fundamental error and have found none. The judgment of conviction and the sentences are affirmed.

HOLOHAN, C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.

---

It was never proven which of the three murderers made this statement, and we cannot impute vileness to all three men because of the statement of one of them.